STATE OF MISSOURI   )
                    ) SS
CITY OF ST. LOUIS   )



**SEP 1 5 2017**

22ND JUDICIAL CIRCUIT
CIRCUIT CLERK'S OFFICE
BY _____ DEPUTY

**MISSOURI CIRCUIT COURT
TWENTY-SECOND JUDICIAL CIRCUIT
(City of St. Louis)**

STATE OF MISSOURI,          )
                            )
          Plaintiff,        )
                            )    No. 1622-CR02213-01
          vs.               )
                            )    Division No. 23
JASON STOCKLEY,             )
                            )
          Defendant.        )

<u>FINDINGS AND VERDICT</u>

Defendant, a St. Louis police officer at the time of the
events at issue here, has been charged with first degree murder
and armed criminal action for the shooting death of Anthony
Smith following a high speed pursuit on city streets.

The Court has closely examined the evidence, has viewed the
State's video exhibits multiple times, has reviewed the
testimony of the witnesses, and has considered the arguments of
the parties.  In reaching a decision in this case the Court is
bound by the Code of Judicial Conduct, and specifically, Rule 2-
2.4, which provides that "a judge shall not be swayed by
partisan interests, public clamor or fear of criticism."  The
Comment to this Rule provides, "A fair, impartial, and
independent judiciary requires that judges decide cases
according to the law and facts, without regard to whether

**EXHIBIT A**

particular laws or litigants are popular or unpopular with the public, the media, government officials, or the judge's friends or family."

Chronologically, the factual events at issue in this case occurred in 2011. Defendant was interviewed by the F.B.I. on May 30, 2012 about the events of December 20, 2011, and the criminal charges in this case were brought in the Spring of 2016.[1] No federal criminal charges have been pursued by the Civil Rights Division of the United States Department of Justice.

The relevant events began on December 20, 2011 when a silver Buick being driven by Anthony Smith pulled into a parking space at a Church's Fried Chicken restaurant.[2] Mr. Smith and his companion, Kirkwin Taylor, exited the vehicle, leaving the engine running and the windshield wipers operating, and walked into the restaurant. Mr. Taylor subsequently walked to the rear of the building where, he testified, he urinated. Mr. Smith returned to the vehicle a couple of times, opened the door on the driver's side and reached in, and then returned to the front of the restaurant. Mr. Taylor was walking back to the front of

---

[1] The complaint was filed on May 16, 2016 and the indictment was filed on August 8, 2016.
[2] State's Exhibit 2, a surveillance video from the restaurant, was admitted into evidence and was played at the trial.

2

the restaurant when a marked police vehicle drove by.  The
police vehicle is then seen driving rapidly up to and stopping
behind the silver Buick as Smith ran up to and got into the
Buick.[3]  Mr. Smith did not have a bag containing food on any of
the occasions when he returned to the car.  Two police officers
exited the police vehicle, Stockley from the passenger's side
and Brian Bianchi from the driver's side, and approached Mr.
Smith's car.[4]  Mr. Smith rapidly pulled forward up to the
building, then frantically drove his Buick backward crashing
into the marked police vehicle twice, before speeding away at a
high rate of speed.  Mr. Smith's Buick did not "gently strike"
the police vehicle.  Smith's Buick forcefully struck the police
vehicle twice, striking the police vehicle hard enough to cause
the driver's side door to slam shut, and also struck a red sedan
parked on the lot adjacent to, and perpendicular to, the police
vehicle.  Smith struck the red car hard enough that it could be
seen to rock back and forth on the surveillance video.

   After completing a "five point turn" Smith drove off the
parking lot, striking the hand of Stockley, who had a gun drawn,

---

[3] Defendant Stockley testified he observed a hand to hand transaction between
Smith and another person, and Stockley believed it to be a drug transaction.
Stockley testified the officers decided they needed to investigate the
suspicious activity.
[4] Brian Bianchi was a relatively new police officer on December 20, 2011.

and Smith sped away.  Bianchi swung at the driver's door of the

Buick with his gun, breaking the window, and then as Smith sped

off the parking lot Bianchi returned to the police vehicle while

holstering his gun.  Stockley testified that Bianchi yelled

"gun" at the time Bianchi broke the driver's window on the

Buick, indicating Smith had a gun in the car, and Stockley

testified that he saw a gun in Smith's hand on the passenger

seat of the Buick as the Buick was pulling away.  Stockley fired

shots from his police department issued Baretta at the Buick as

it sped off.  Stockley then got into the police vehicle and told

Bianchi to "get him."

Anthony Smith drove at speeds up to 87 miles per hour, on

wet roads, endangering other drivers and pedestrians, and the

police pursuit was in response to Smith's perilous conduct.  The

pursuit lasted for approximately three (3) minutes.  The pursuit

ended when Smith drove into oncoming traffic and was bumped from

behind by the police vehicle being driven by Brian Bianchi.  It

is apparent from the dash cam video recording, which includes

audio from inside the police vehicle, that this pursuit was a

stressful event for the occupants.  Due to multiple radios being

turned on (Stockley's, Bianchi's, and the car communication

radio) there were confusing sounds including feedback on the

4

radios and communications with a police dispatcher.  One of the occupants of the police vehicle said on the radio multiple times, "shots fired, shots fired."[5]  During the pursuit Bianchi at one point started to turn right where the Buick had turned left, and Bianchi also hit a sign and a tree and had to back up to continue the pursuit.

Approximately 45 seconds before the pursuit came to an end, the audio contains a garbled and unintelligible statement, in the middle of which Stockley said, "we're killing this motherfucker, don't you know."[6]

The dash cam video from the police vehicle continued to run for a time after the vehicles came to a stop.  Smith's car came to a stop perpendicular to and adjacent to the curb, when it was struck by the police vehicle, and the police vehicle came to a stop parallel to the curb with its front end adjacent to the right rear of Smith's car.  Stockley testified it was decided to attempt to end the pursuit by striking Smith's car when Smith started to drive head-on into oncoming traffic.

---

[5] Police officer John Baumgartner testified that "shots fired" means somebody has fired shots, either a suspect or a police officer.

[6] The statement was not intelligible when the recording was played during the trial.  However, Stockley did not deny making the statement.  He testified he could not recall making the statement and he could not recall the context. The context is not clear from the recording; it cannot be determined what was said immediately before and immediately after the statement.

After both vehicles came to a stop, Bianchi is seen on the
dash cam video running up to the driver's window of the Buick.
Bianchi has his hand on his gun, which is in the holster, as he
runs up to the Buick.  He then leans down at the driver's side
window briefly before Stockley approaches and leans down at the
driver's window.  One can see Bianchi's exhaled breath in the
cold air, as he approaches the driver's window, and another
large exhale of his breath as Bianchi leans down at the window.
The view from the dash cam is over the top of the Buick; it
cannot be seen what is occurring inside the car.  While Stockley
is bent over at the driver's window, out of sight of the dash
cam, it appears that Stockley is wrestling with something or
someone at the window and Bianchi approaches again.  At one
point it appears Stockley's breath blows off to his right when
he stands up; his breath again appears to blow off to his right
as he is bent down at the driver's window.  Stockley's right
elbow can be seen rising up as if he is unholstering his gun,
Bianchi suddenly backs up, and it appears that at this point
Stockley fires into the car.  It cannot be determined from the
dash cam video how far Stockley's hand, holding the gun, is from
Smith at the time the shots are fired, or precisely when each

6

shot was fired.  At the time the shots are fired, Stockley is
wearing what, on the video, appear to be winter gloves.

Antonio French, a witness for the State, said he was on the
second floor of his club where Mr. French and a few others were
cleaning the club up for the next event.  Mr. French testified
he heard a loud crash, he went to the window and he saw two
officers, one with a firearm, approach the crashed car.  Mr.
French saw an officer at the driver's door and heard the officer
say, "open the fucking door, open the fucking door."  The
officer then fired shots into the car.  Mr. French recorded from
the second floor window the events that followed the shooting
for several minutes, and his cell phone video was introduced as
Exhibit 5 and was played at the trial.  Mr. French said the
officer fired four or five shots all together in sequence.  He
could not see anything inside the car.  Mr. French said the
officer came up to the door and pulled on the door three times
without the door opening prior to the shots being fired.

Monte Jodeh, a witness for the defense, testified that he
was at a store across the street from the scene of the shooting
(the evidence shows he was across the street diagonally from the
scene).  Mr. Jodeh heard a crash and ran to the door.  He
testified he saw two officers at the driver's side window of

Smith's car.  Jodeh said he saw and heard struggling and
murmuring.  He could not see into the car because the airbags
had been deployed.  Something happened that startled the
officers, and then he heard four or five shots in succession
with the officer firing the shots stepping back.  He said there
was no break between the shots.

Police Officer Elijah Simpson testified that he was the
first officer, other than Stockley and Bianchi, to respond to
the scene on December 11, 2011.  Before he arrived at the scene
he had observed a police vehicle pursuing a silver car.  Simpson
did a U-turn and followed the pursuit.  When the other two cars
came to a rest, he parked his police vehicle and approached the
scene.  Stockley and Bianchi were at the silver vehicle and
airbags in the silver car had been deployed.  Both Bianchi and
Stockley had 9 mm. Barettas drawn when Simpson arrived, but
Simpson did not see or hear gunshots.  Simpson said Stockley
told him to "watch his hands" and Simpson's belief was that the
person in the car had a gun, but he could not recall whether
anybody specifically warned him that the person inside the car
had a gun.  Simpson also heard Stockley tell the driver of the
car to "show me your hands."

John Baumgartner, who is currently a Richmond Heights police officer, testified he was a patrolman for the St. Louis Police Department in December 2011. Baumgartner said he arrived at the scene several minutes after the shooting. He said he recognized several officers from the Sixth District who were present but he did not speak with any officers other than maybe to ask if they were okay. Stockley did not provide him with any information after Baumgartner arrived at the scene. At some point he was told there was a gun in the car and Sergeant Rumpsa told him to recover the gun from the car. The gun (a .38 Special) had been "made safe" by removing the cartridges from the gun. The car had already been searched by another officer and the items had been left on the passenger seat. Baumgartner said a bag containing narcotics was also recovered from inside the car.[7] Baumgartner said there are two different jobs involved at that point, one by a searching officer who would search the car, and one by a seizing officer who would be told what's there and who would recover it.

Lieutenant Kirk Deeken testified that in December 2011 he was notified of an officer involved shooting. He viewed the dash cam video and briefly spoke with the Deputy Commander, and

---

[7] Mr. Smith's DNA was on this bag, and the contents were later determined to be heroin.

9

then said the FBI should be contacted because there was the potential for a criminal investigation.  Lieutenant Deeken also testified that an officer is trained to order a suspect out of a car and to have one's firearm out in case the suspect is armed. One re-holsters one's gun when the threat is over.

Sergeant Brian King testified he was called to the scene where he photographed the entire area.  Sergeant King said five shell casings were recovered from the scene, four on the ground and one on the floorboard of the Buick.

Doctor Gershom Norfleet, a medical examiner, performed the autopsy on Anthony Smith.  Dr. Norfleet testified at the trial that he found five entrance bullet wounds and one exit wound: 1) the left lower neck; 2) left chest; 3) mid left flank; 4) left lower flank; 5) dorsal left forearm (entry); and 6) inside left forearm (exit).  The cause of death was a combination of the shots to the lower flank and chest, one of which went through Smith's heart, and internal bleeding.  Smith did not die from bleeding out.  A toxicology report indicated that at the time of death Smith had metabolites of marijuana in his blood.  Dr. Norfleet did not testify as to the order of the wounds and he could not say whether Smith was reaching for anything at the time he was shot.  Dr. Norfleet said the shots to Smith's left

10

shoulder/lower neck, left chest, left mid flank and lower flank (which was "pretty low") all had the same trajectory.  He said the wound on the shoulder would not have caused Smith's death and to call that shot a "kill shot" would be wrong.

Dr. Norfleet was asked how Smith got a gunshot wound to the lower flank if he was sitting inside the car and was shot from the outside.  Dr. Norfleet said this was not inconsistent with Smith's reaching for a gun at the time he was shot.

David Menendez, a supervisor at the firearm lab, testified that he examined and swabbed the .38 special and saw nothing that was consistent with blood stains.

Eric Hall, a biological screener at the St. Louis Metropolitan Police Department, testified that a DNA test and analysis will determine what DNA, if any, is present but it will not determine whether the DNA is from blood, semen or something else.

Mary Ann Kwiatkowski, a supervisor at the biology section for the St. Louis Metropolitan Police Department, was called as a witness by the State.  Ms. Kwiatkowski testified that she examined screws on the firearm recovered from the Buick for blood.  A test she performed, a presumptive test, indicated possible blood, however, the lab does not perform confirmatory

11

tests, a presumptive test can produce false positives, and DNA testing determines whether DNA is present, but DNA testing does not say what substance the DNA is from.  Ms. Kwiatkowski testified she could not say there was blood on the gun, that in 2011 it was rare to find DNA on a gun, and that the absence of a person's DNA on a gun does not mean that person did not touch the gun.  She reiterated that if DNA is not found on a gun, all she can say is that there is no DNA there, not that someone did or did not touch the gun.

Dr. Karen Preiter, a DNA analyst at the St. Louis Metropolitan crime lab, testified that DNA results from the gun are consistent with Jason Stockley.  Dr. Preiter further said that the absence of a person's DNA does not mean that person did not touch the gun, but it only means there was no DNA present. When DNA is found, all that can be said is there is DNA present, not who else may have touched the gun or how many times anyone touched the gun.

Doug Halepaska, a firearms examiner at the FBI laboratory division in Quantico, Virginia, testified at the trial that he received materials to be examined via a Fed Ex package that was delivered in 2012.  Included in the package was clothing that Anthony Smith had been wearing at the time of his death as well

12

as a hand gun.  He test fired the handgun and examined the
clothing.  He concluded, based on his testing of the jacket,
that the bullet hole related to the shot to the top left
shoulder of the jacket was from six inches or less but was not a
contact shot.

Defendant Stockley testified at the trial.  Defendant is a
graduate of the United States Military Academy at West Point,
N.Y., and he suffered injury to his back while serving in the
United States Army during the January 2004 bombing of the
Shaheen Hotel in Baghdad, Iraq.  He has lingering problems with
his sciatic nerve.  Stockley testified that in December 2011 he
was a certified field training officer for the police
department.

Stockely testified the weather on December 20, 2011 was wet
and "somewhat cold."  He was wearing a bullet proof vest under
his shirt, the pants he was wearing did not have cargo pockets,
and he was wearing a three inch wide duty belt.  Stockley said
he was also wearing his personal gloves for the cold, gloves
which were needle resistant to avoid getting stuck by a sharp
object.

Stockley testified that on December 20, 2011, his partner
was Brian Bianchi who was six months off probation.  Their

13

assignment was to take 911 calls, and to proactively look for
drug or burglary activity.  As they were driving by the Church's
restaurant they observed suspicious activity and decided to
investigate.  Stockley said he had never seen the silver Buick
before, they were not looking for it at the time, they did not
know either person involved in the perceived drug transaction,
and they initially did not know either participant in the
perceived transaction was connected to the silver Buick at the
time they observed the transaction.

Stockley testified that he heard Bianchi yell "gun" at the
time Bianchi broke the driver's window on the Buick, and
Stockley then saw the driver's hand on a gun on the passenger
seat as the Buick drove by him and was pulling away.

Stockley said that the pursuit was a high risk situation
during which he was feeling fear.  When asked about the
statement, "kill that motherfucker" he could not remember making
the statement.  He said he had not made a decision to kill Smith
and he could not recall the context in which the statement was
made.

Stockley testified that after the pursuit ended he exited
the police vehicle and went around to the driver's side door.
When he got to the door, the airbag which had deployed was

14

lifted up by Bianchi and Stockley said he could see Smith
reaching around, patting around with his right hand.  Stockley
told Smith to "show me your hands" repeatedly, but Smith
continued reaching around.  Suddenly Smith's demeanor changed,
around fifteen seconds after Stockley reached the driver's
window, when Smith reached between the seats, and Stockley said
he thought Smith had retrieved the gun.  Stockley reached for
his Baretta (his service revolver) and stepped back because he
was scared Smith would pull up his hand and shoot him.  Stockley
then fired several shots at Smith, which ultimately resulted in
Smith's death.  Stockley said he did not initially have his
Baretta drawn when he got to the driver's window.

     Evidence of what occurred following the shooting was
provided through, among other things, the cell phone video taken
by Mr. French from the second story window overlooking the
scene.  When the cell phone video first starts, Stockley is seen
walking from the driver's side of the Buick back to the left
rear door of the police vehicle, where he opens the door, places
his AK-47 on the rear seat, then closes the door and walks back
to the driver's side of the Buick.  Another officer is standing
at the door with his gun drawn and aimed into the Buick.
Stockley then returns to the police vehicle, removing gloves

15

from both hands while approaching the vehicle, and he then
climbs in and reaches across the rear seat.[8]  Stockley testified
he took his gloves off as he returned to the police vehicle
because he was going to retrieve Quick Clot, which is used to
stop bleeding, from his personal bag which was on the back seat
of the police vehicle, and he said it's hard to feel what you're
touching with the gloves on.  Stockley then exits the police
vehicle and returns to the driver's side of the Buick and
proceeds to walk all the way around the Buick and the adjacent
police vehicle where he meets with Bianchi and Sergeant Rumpsa.
Stockley can be seen on all sides while walking around the two
vehicles.  Stockley does not have a jacket on over his blue
police uniform shirt.  There is no gun, other than his holstered
service revolver, visible in his hands, in his pockets or tucked
into his belt, and there is no bulge from a gun in any pocket.
As other officers gather at the scene, they do not appear to be
wearing gloves as they approach the Buick or other officers.
After conferring with Bianchi and Rumpsa, Stockley again returns
to the driver's side of the Buick and again there is no gun in

---

[8] A video recording from inside the police vehicle shows Stockley was reaching
across the rear seat to a personal bag, which he reaches around in, and then
exits the vehicle.  Stockley does not have anything in either hand during the
brief periods his hands are in view on this video, immediately before he
exits.  The video does not show defendant trying to stealthily recover a
revolver and conceal it on his person.

16

his possession other than his holstered service revolver.  After
Smith is removed from the Buick, Stockley gets in on the
driver's side; there are six other officers visible immediately
adjacent to the Buick, and initially four of them are by the
driver's door looking in.  The evidence at trial was that
Stockley got into the car to search for a weapon, and Stockley
testified that he found a handgun tucked down between the seat
and the center console.  He rendered the gun safe by unloading
cartridges from the cylinder, and then left the gun and
cartridges on the passenger seat.  A demonstration at the trial
of how the gun was unloaded showed that a person would hold the
gun tightly by its grip in one hand, and with the other hand
unlock the cylinder and remove any cartridges.

No charges were filed by the State in this case until the
Spring of 2016, and no federal charges have been filed.

The key issues in this case are whether the shooting of
Anthony Smith was an intentional killing following deliberation
by Stockley, or whether the shooting of Smith was a lawful use
of deadly force by a police officer who was reasonably acting in
self-defense.  All of the witnesses who testified at the trial,
other than defendant Stockley and Monte Jodeh, were called as
witnesses for the State.

17

A criminal defendant is presumed innocent and the State has the burden to prove a defendant guilty beyond a reasonable doubt.  State v. Henton, 753 S.W.2d 19, 20 (Mo.App.E.D. 1988). Due process requires the State to prove every element of a crime beyond a reasonable doubt.  State v. Neal, 328 S.W.3d 374, 378 (Mo.App.W.D. 2010).  Proof beyond a reasonable doubt is proof that leaves the finder of fact "firmly convinced of the defendant's guilt."  See, MAI-Cr 4th 402.04.  The burden on the State to prove a criminal defendant's guilt beyond a reasonable doubt applies to every criminal defendant in every case.

The version of the statute on first degree murder that was in effect in December 2011 provided that "a person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter." § 565.020.1 RSMo. 2000.  Therefore, the three elements of first degree murder are: (1) knowingly; (2) causing the death of another person; and (3) after deliberation upon the matter. "Deliberation" is defined as "cool reflection for any length of time no matter how brief."  § 565.002(3).  "Like any state of mind, deliberation generally must be proved through the surrounding circumstances of the crime."  State v. Ferguson, 20 S.W.3d 485, 497 (Mo.banc 2000).

The defendant has the burden of injecting the issue of self-defense.  § 563.031.5 RSMo 2016.  However, the defendant does not have the burden of proof on the issue of self-defense. State v. Morley, 748 S.W.2d 66, 68 (Mo.App.S.D. 1988).  It does not matter which side presents the evidence that supports the issue of self-defense.  State v. Fincher, 655 S.W.2d 54, 58 (Mo.App.W.D. 1983).  If there is evidence to support self-defense, the State has the burden of disproving the defense beyond a reasonable doubt.  State v. Watson, 839 S.W.2d 611, 615 (Mo.App.E.D. 1992).

A law enforcement officer need not retreat or desist from efforts to arrest or prevent the escape of a person the officer believes to have committed an offense.  A law enforcement officer is entitled to use deadly force where the officer reasonably believes the use of deadly force is necessary to effect the arrest and reasonably believes the person is attempting to escape by the use of a deadly weapon or may otherwise endanger life or inflict serious physical injury. § 563.046 RSMo 2000.

The State contends it has met its burden of proof as to murder in the first degree because the statement made by officer Stockley during the pursuit that "we're killing this

19

motherfucker" was followed by Stockley shooting Smith while
Smith was seated in his car.  The State contends Stockley's
statement during the pursuit proves Stockley intended to kill
Smith and that he deliberated about doing so, prior to shooting
Smith when the pursuit ended.  The State argued that Stockley
initially fired four shots at Smith, who the State contends was
not in possession of a firearm in the car, and then after a gap
in time fired a fifth shot at close range into Smith's lower
neck/shoulder.  The prosecutor referred to this fifth shot as a
"kill shot" that was fired because the first four shots did not
kill Smith.  The State argued that a "puff of smoke" seen on the
dash cam video came from the "kill shot" and supports the
State's theory of a fifth shot separated in time from the first
four shots.  The State claims Stockley did not act in self-
defense because Smith was not in possession of a firearm, and
the firearm found in the car was planted by Stockley.

The Court believes it is significant that defendant
Stockley and Smith did not know each other prior to December 20,
2011, they had no prior history, there was no history between
Stockley and members of Smith's family, and there was no basis
in the evidence to suggest any pre-existing animosity by

20

Stockley towards Smith.[9]  There was also no evidence that
Stockley even knew who was being pursued.

Commencing in the parking lot of the Church's restaurant,
when Anthony Smith rammed into the police vehicle twice, and
then struck Stockley's arm with the car while fleeing, officers
Bianchi and Stockley were involved in a dangerous high speed
pursuit.  It is apparent from the dash cam audio and video that
the pursuit was stressful both from the high speed nature of the
pursuit and from confusion caused by the multiple radios and
communications with a dispatcher.  People say all kinds of
things in the heat of the moment or while in stressful
situations, and whether Stockley's statement that "we're killing
this motherfucker," which can be ambiguous depending on the
context, constituted a real threat of action or was a means of
releasing tension has to be judged by his subsequent conduct.

The Court does not believe Stockley's conduct immediately
following the end of the pursuit is consistent with the conduct
of a person intentionally killing another person unlawfully.[10]

---

[9] The defense wanted to introduce evidence that Anthony Smith had an
outstanding parole violation warrant and a felony record.  However, the Court
ruled that such evidence is not relevant and can be given no weight as the
defendant did not know Mr. Smith and he had no knowledge of any criminal
history at the time of the relevant events here.
[10] The Court also believes the dangerous, highly stressful and frenetic events
during and immediately following the pursuit and shooting on December 20,
2011, are the antithesis of "cool" anything, much less reflection.

Stockley did not approach the Buick and immediately shoot Smith
multiple times.  Stockley had been warned by Bianchi that Smith
had a gun.  Stockley approached the driver's side, appeared to
attempt to open the door and, as testified to by the State's own
witnesses, ordered Smith to open the door and to show his hands.
Stockley also warned another officer to "watch his hands."  It
was not until fifteen seconds after Stockley arrived at the
driver's side door, that he unholstered his service revolver and
fired several shots in succession.

The Court finds the State's contention there was a fifth
"kill shot" fired by Stockley after a gap in time, is not
supported by the evidence.  No witness testified to hearing a
shot separated in time from the first group of successive shots.
Antonio French, a fact witness for the State, testified that the
gun shots were in rapid succession and that one shot was not
separated in time from the other shots.  There was also no
evidence regarding the order in which Smith's wounds were
inflicted.  The Court finds the State's reliance on a "puff of
smoke" as evidence of a fifth shot separated in time from the
others is not supported by the evidence.  There was no puff of
smoke from any of the other shots, and there was no testimony
that firing a service revolver would or could cause such a puff

22

of smoke.  There was also no explanation offered for why such a "puff of smoke" would be seen outside the car if such a fifth shot was fired with the gun inside the car as the State contends.  It seems more reasonable to conclude that what the State characterizes as a "puff of smoke" was in reality exhaled breath in cold air.  Puffs of smoke are seen multiple times on the dash cam video unrelated to the firing of any gun, but coming from the mouths of officers in the cold air.

The State made much of the fact that Stockley was in possession of an AK-47 pistol on December 20, 2011.  Stockley admitted he was in possession of such a weapon, he testified he knew his possession of such a weapon was in violation of department policy, but he said he had it with him to use as a deterrent in situations in which he (and other officers) might be facing persons armed with more dangerous weapons than a Baretta service revolver.  There is no evidence he ever fired this weapon, and while Stockley's possession of the gun might be a matter for departmental discipline, it is not relevant to the criminal charges here.

The defense does not deny that Stockley shot and killed Smith.  Rather, the defense contends Stockley acted in self-defense and that Stockley's use of deadly force, as a police

23

officer, was justified because Smith was armed with a handgun, had demonstrated that he was a danger to other persons by the manner in which he fled from the police at high speed, and Stockley did not shoot Smith until Smith reached for his gun.

Section 563.061 RSMo Supp. 2010, the statute in effect in December 2011 which governed the defense of self-defense, provided that a person could use physical force upon another person "when and to the extent he or she reasonably believes such force to be necessary to defend himself or herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful force by such other person." Subsection 2 of the statute provided that a person could not use deadly force upon another person unless he or she reasonably believed that such deadly force was necessary to protect himself or herself "against death, serious physical injury, or any forcible felony."

A fact issue that is central here is whether Smith was in possession of a firearm inside the car at the time he was shot. The State contends Anthony Smith was not in possession of a firearm inside the silver Buick and that Stockley planted the firearm that was recovered from the Buick.

Stockley testified that Bianchi warned him of a gun in the Buick at the Church's restaurant, and that he observed a gun in Smith's hand as the Buick drove past him.  Stockley testified he did not draw his service revolver and fire until after he saw Smith reaching around inside the car and then change his demeanor suggesting to Stockley that Smith found the gun.  A handgun was found inside the Buick after the shooting.

The Court finds the State's contention that Stockley planted the handgun found in the Buick is not supported by the evidence.[11]  The gun was a full size revolver and not a small gun, such as a derringer, that can fit in the palm of one's hand or into the side pocket on a pair of pants without being obvious.  Stockley was not wearing a jacket; if he had such a gun in his possession it would have been visible on the cell phone video.  The gun was too large to fit entirely within any of the pockets on the pants he was wearing, there was no bulge in any pocket indicating a gun within the pocket, and the gun would have been visible if it was tucked into his belt.  There

---

[11] Mr. Taylor, Mr. Smith's companion when he arrived at the Church's restaurant and who has a felony drug conviction, from Pike County, Missouri, and a fifteen year (15) sentence, with execution of the sentence suspended, testified that he did not see Smith with a handgun and he did not know there was heroin in the car.  The Court finds Taylor's testimony has no probative value and was not credible.  Taylor was impeached with his own deposition testimony that he did not recall anything about that day, and he was impeached with several inconsistencies between his trial and deposition testimonies.

25

were several officers standing around adjacent to the driver's side of the Buick and not one of them was called to testify that they saw Stockley plant a gun in the Buick.  The State's argument that the presence of Stockley's DNA and the absence of Smith's DNA on the gun proves the gun was not in Smith's possession but must have belonged to and been planted by Stockley is refuted by the State's own witnesses.  Mary Ann Kwiatkowski and Dr. Karen Preiter both testified that the absence of a person's DNA on a gun does not mean that person did not touch the gun.

Finally, the Court observes, based on its nearly thirty years on the bench, that an urban heroin dealer not in possession of a firearm would be an anomaly.

The State further contends Stockley did not act in self-defense because Officer Bianchi did not perceive Smith to be a threat.  Brian Bianchi, defendant's partner on December 20, 2011, did not testify at the trial.  At the time of the shooting, Bianchi was an inexperienced police officer.  To draw compelling inferences from Bianchi's actions or inactions is not a reliable endeavor, and would amount to mere speculation. Officer Bianchi only holstered his revolver on the Church's restaurant parking lot when Smith drove away at high speed.

26

Stockley testified Bianchi warned him on the Church's parking
lot about a gun.  The Court does not believe one can draw any
inferences regarding Bianchi's state of mind from Bianchi's
actions at the side of the Buick prior to the shooting.  It is
worth noting that Stockley did not perceive Smith to be an
imminent threat while he was initially interacting with Smith
through the driver's window after the pursuit, but only after
fifteen seconds had passed during which Smith was ordered to
show his hands and open the door, and only when Stockley
believed Smith had located the gun.

The State further argues that Stockley removed his gloves
when he returned to the police vehicle with the purpose of
providing an explanation for his DNA being on the handgun
recovered from Smith's vehicle.  The gloves he removed were
winter gloves, Stockley's explanation for removing the gloves is
plausible, other officers at the scene either did not have
winter gloves or had removed them prior to exiting their
vehicles, and it makes sense that a person would remove winter
gloves when searching for something inside a personal bag.  Here
Stockley was searching inside his personal bag, and he testified
he was searching for Quick Clot.  In the absence of any evidence
showing Stockley in possession of the gun prior to his entering

27

the Buick to search, this contention regarding the gloves makes no sense.

One obvious question the State made no attempt to answer was how Anthony Smith could have been shot in the left lower abdomen by a person standing outside the car if Smith was simply sitting in the driver's seat.  Dr. Norfleet, who conducted the autopsy, testified that the wounds in Smith's left flank could indicate that Smith was reaching for something to his right at the time the wounds occurred.  This would be consistent with Stockley's testimony regarding Smith's actions immediately prior to the shooting.

No one promised a rose garden, and this surely is not one. Missouri law requires that the trier of fact be "firmly convinced" of the defendant's guilt in order to convict.  As stated above, the burden on the State to prove a criminal defendant's guilt beyond a reasonable doubt applies to every criminal defendant.  The requirement that the State meet its burden of proof is not a mere "technicality" and the instant case is not decided on a technicality.

This Court, as the trier of fact, is simply not firmly convinced of defendant's guilt.  Agonizingly, this Court has poured over the evidence again and again.  This Court has viewed

28

the video evidence from the restaurant's surveillance camera, the cameras in the police vehicle, and the cell phone video by the lay witness, over and over again - innumerable times.

This Court, in conscience, cannot say that the State has proven every element of murder beyond a reasonable doubt or that the State has proven beyond a reasonable doubt that defendant did not act in self-defense.

The State asked the Court to consider, should it find defendant not guilty of first degree murder, whether defendant is guilty of a lesser degree of homicide.  The defense did not ask the Court to consider lesser offenses.

The lesser degree offenses of first degree murder are listed in § 565.025 RSMo.  This Court has found that the State did not prove beyond a reasonable doubt that Stockley did not act in self-defense.  The issue is whether a finding that the defendant was not guilty of an intentional killing based on the defense of self-defense forecloses the possibility of a conviction of a lesser degree of homicide.

The Missouri Supreme Court has held that self-defense in a homicide does not foreclose a conviction for involuntary manslaughter if the defendant was entitled to use force while acting in self-defense, but exceeded the scope of the self-

29

defense privilege by using an unreasonable amount of force.
This is because an intentional act of self-defense may
constitute reckless conduct if the force used was unreasonable.
State v. Beeler, 12 S.W.3d 294 (Mo.banc 2000); State v. Pulley,
356 S.W.3d 187 (Mo.App.E.D. 2012).  Given that the State here
has failed to prove beyond a reasonable doubt that defendant's
use of deadly force was not justified in self-defense, the Court
need not address lesser degrees of homicide including
involuntary manslaughter.

WHEREFORE, it is ordered, adjudged and decreed that the
State has failed in its burden of proof and the Court finds that
defendant is not guilty of both charges in this case, murder
first degree and armed criminal action.


                         SO ORDERED:

                         _____
                         Timothy J. Wilson, Judge
                                                  23161
Dated: September 15, 2017