## IN THE UNITED STATES DISTRICT COURT EASTERN DISTRICT OF MISSOURI EASTERN DIVISION

CHRISTOPHER ROBERTSON,     )
    )
    Plaintiff,     )
    )
v.     )
    )
CITY OF SAINT LOUIS, et al,     )    Cause No.: 4:18-cv-01570-JAR
    )    JURY TRIAL DEMANDED
    )
    Defendants.     )

## DEFENDANT CITY OF ST. LOUIS' ANSWER TO PLAINTIFF'S THIRD AMENDED COMPLAINT

Defendant City of St. Louis files this answer and affirmative defenses to Plaintiff's Third Amended Complaint. Any averment of fact that is not expressly admitted herein is denied.

## JURISDICTION AND VENUE

1.    Plaintiffs brings this claim pursuant to 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and the First and Fourth Amendments, as incorporated as against States and their municipal divisions through the Fourteenth Amendment.

**ANSWER:    Paragraph 1 states no allegations of fact requiring no response. To the extent a response is required, Defendant admits that Plaintiffs bring this action under 42. U.S.C. § 1983, but denies the apparent allegation of a direct action under the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.**

2.    The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because Plaintiffs' action arises under the Constitution of the United States and § 1343(a)(3) to redress the deprivation of rights secured by the Constitution of the United States.

**ANSWER:    Paragraph 2 states no allegations of fact, requiring no response. To the**

extent a response is required, Defendant admits that this Court has jurisdiction.

3.      Venue is proper in the United States District Court for the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in the City of St. Louis.

**ANSWER:      Paragraph 3 states no allegations of fact, requiring no response. To the extent a response is required, Defendant admits that venue is proper.**

4.      Divisional venue is proper in the Eastern Division because a substantial part of the events leading to the claims for relief arose in the City of St. Louis and Defendant reside in the Eastern Division. E.D. Mo. L.R. 2.07(A)(1), (B)(1).

**ANSWER:      Paragraph 4 states no allegations of fact, requiring no response. To the extent a response is required, Defendant admits that venue is proper.**

5.      This Court has supplemental jurisdiction over the included Missouri state law claims pursuant to 28 U.S.C. §1367.

**ANSWER:      Paragraph 5 states no allegations of fact, requiring no response. To the extent a response is required, Defendant denies paragraph 5's allegations.**

6.      Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38(b).

**ANSWER:      Defendant admits that Plaintiffs have requested a jury trial.**

<u>**PARTIES**</u>

7.      Defendant the City of St. Louis, Missouri (hereinafter, "City of St. Louis") is a first-class city, and a political subdivision of the State of Missouri duly organized under the Constitution of Missouri.

**ANSWER:      Defendant admit that the City of St. Louis is a constitutional charter City organized and existing under the laws of the State of Missouri, but denies all other allegations of paragraph 7.**

8.     The St. Louis Metropolitan Police Department ("SLMPD") is an instrumentality of the City of St. Louis, Missouri organized and controlled pursuant to the Statutes of the State of Missouri.

**ANSWER:     Defendant admit that the division of police is a division or agency of the City of St. Louis and is commonly known as the St. Louis Metropolitan Police Department, and that the Division of Police operates in accordance with law as a division within City government, but denies all other allegations of paragraph 8.**

9.     The Public Facilities Protection Corporation of the City of St. Louis insures the SLMPD.

**ANSWER:     Defendant denies the allegations of paragraph 9.**

10.     Lawrence O'Toole was employed as a Lt. Colonel with the SLMPD during the events of September 17, 2017, as detailed in this Complaint. On that date, he was the acting Chief of Police and, along with Defendant Charlene Deeken, was responsible for all management and direction of the SLMPD. Defendant O'Toole knew or should have known that there was no probable cause for the arrests of Plaintiffs and that there was no legal justification to use force against Plaintiffs. Defendant O'Toole is a department head and is covered by Article VIII, Section 5 of the Charter of the City of St. Louis. Defendant O'Toole is sued in his individual capacity.

**ANSWER:     Defendant admits Lawrence O'Toole is employed as a police officer with the division of police. Defendant admit he was the Acting Chief of Police on September 17, 2017. Defendant denies all remaining allegations of paragraph 10.**

11.     Charlene Deeken was employed as the Director of Public Safety for the City of St. Louis during the events of September 17, 2017. SLMPD is a subdivision of the St. Louis Department of Public Safety. As such, she was the direct supervisor of Defendant O'Toole. On September 17, 2017, Defendant Deeken and Defendant O'Toole were responsible for all

3

management and direction of the SLMPD. Defendant Deeken is a department head and is covered

by Article VIII, Section 5 of the Charter of the City of St. Louis. Defendant Deeken is sued in her

individual capacity.

**ANSWER:     Defendant admits Charlene Deeken was employed as the director of**
**Public Safety on September 17, 2017. Defendant denies all remaining allegations of**
**paragraph 11.**

12. Gerald Leyshock is employed as a police officer with the SLMPD. Mr. Leyshock has the

rank of lieutenant colonel. Mr. Leyshock was the incident commander during the events of

September 17, 2017. Lieutenant Colonel Leyshock knew or should have known that there was no

probable cause for the arrest of Plaintiffs and that there was no legal justification to use force

against Plaintiffs. Defendant Leyshock is sued in his individual capacity.

**ANSWER:     Defendant admits Gerald Leyshock is employed as a police officer**
**with the division of police and has the rank of lieutenant colonel. Defendant admit Gerald**
**Leyshock was the incident commander during the events of September 17, 2017. Defendant**
**denies all remaining allegations of paragraph 12.**

13.  Timothy Sachs is employed as a police officer with the SLMPD. Mr. Sachs has the rank

of lieutenant. Mr. Sachs was on the ground supervising SLMPD officers during the events of

September 17, 2017. He ordered the use of chemical agents and brought SLMPD's Civil

Disobedience Team to the scene of the mass arrest. Lieutenant Sachs knew or should have known

that there was no probable cause for the arrest of Plaintiffs and that there was no legal justification

to use force against Plaintiffs. Defendant Sachs is sued in his individual capacity.

**ANSWER:     Defendant admit Timothy Sachs was employed with the division of**
**police and had the rank of lieutenant. Defendant admit Timothy Sachs was present for**
**protest activities and police response on September 17, 2017. Defendant denies all**

**remaining allegations in paragraph 13.**

14. Daniel Howard is employed as a police officer with the SLMPD. Defendant Howard has the rank of major. On the night of the incident, he was commander of the South Patrol. Howard was on the ground supervising SLMPD officers during the events of September 17, 2017. Defendant Howard also assisted Leyshock with planning the kettling event. Defendant Howard knew or should have known that there was no probable cause for the arrests of Plaintiffs and that there was no legal justification to use force against Plaintiff. Defendant Howard is sued in his individual capacity.

**ANSWER:    Defendant admit Daniel Howard was employed with the division of police and had the rank of lieutenant. Defendant admit Defendant Howard c was present for protest activities and police response on September 17, 2017. Defendant denies all remaining allegations in paragraph 14**

15.    Randy Jemerson is employed as a police officer with the SLMPD. Mr. Jemerson has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Mr. Jemerson was on the ground supervising SLMPD officers during the events of September 17, 2017. Sergeant Jemerson knew or should have known that there was no probable cause for the arrest of Plaintiffs and that there was no legal justification to use force against Plaintiffs. Defendant Jemerson is sued in his individual capacity.

**ANSWER:    Defendant admits Randy Jemerson is currently employed as a police officer with the division of police and has the rank of lieutenant. Defendant admit that Randy Jemerson was a supervisor with the Civil Disobedience Team. Defendant denies all remaining allegations in paragraph 15.**

16.    Brian Rossomanno is employed as a police officer with the SLMPD. Mr. Rossomanno

5

has the rank of sergeant. He is a supervisor with the SLMPD's Civil Disobedience Team, a team tasked with handling protests and incidents of civil unrest. Mr. Rossomanno was on the ground supervising SLMPD officers during the events of September 17, 2017. Sergeant Rossomanno knew or should have known that there was no probable cause for the arrest of Plaintiffs and that there was no legal justification to use force against Plaintiffs. Defendant Rossomano is sued in his individual capacity.

**ANSWER:** **Defendant admit Brian Rossomanno was employed with the division of police and had the rank of sergeant during the events of September 17, 2017. Defendant admit Brian Rossomanno was a supervisor of the Civil Disobedience Team. Defendant denies all remaining allegations in paragraph 16.**

17.     Defendant Lieutenant Kimberly Allen, Lieutenant Scott Aubuchon, Lieutenant Scott Boyher, Lieutenant Daniel Chitwood, Lieutenant Bill Kiphart, Lieutenant James Joyner, Lieutenant Christi Marks, Lieutenant Michael Mayo, Lieutenant Donnell Moore, Lieutenant Paul Piatchek, Sergeant Eric Bartlett, Sergeant Ronald Bergmann, Sergeant Michael Binz, Sergeant James Buckeridge, Sergeant Curtis Burgdorf, Sergeant Joe Carretero, Sergeant Anthony Caruso, Sergeant James Clark, Sergeant Darnell Dandridge, Sergeant Adam Duke, Sergeant Kelly Fisher, Sergeant Brandt Flowers, Sergeant Samuel Gilman, Sergeant Patrick Haug, Sergeant John Jones, Sergeant Matthew Karnowski, Sergeant Robert Lammert, Sergeant Joe Lankford, Sergeant Robert Laschober, Sergeant Tom Long, Sergeant Kyle Mack, Sergeant Mike Mandle, Sergeant Michael Marks, Sergeant Mark McMurry, Sergeant James Murphy, Sergeant Dennis Neal, Sergeant Patricia Nijkamp, Sergeant Kenneth Nizick, Sergeant Donald Re, Sergeant Bradley Roy, Sergeant Daniel Schulte, Sergeant Michael Scego, Sergeant Timothy Schumann Sergeant Brian Seppi, Sergeant Stephen Slama, Sergeant Cliff Sommer, Sergeant Timothy Turner, Sergeant Scott Valentine, Sergeant Charles Wall, Sergeant Donnell Walters, Sergeant Scott Weidler, Sergeant Carolyn Wiener, and Sergeant Anthony

Wozniak ("Supervisor Officers") were employed as senior officers with the SLMPD during the events of September 17, 2017, as detailed in this Complaint. According to the City's own documents, Supervisor Officers supervised SLMPD Officers during the events in question, directed the police officers in their command to arrest the persons at the intersection of Washington and Tucker, and knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. These Defendants are sued in their individual capacities.

**ANSWER:    Defendant admits that each officer listed in paragraph 17 was employed with the division of police on September 17, 2017. Defendant denies paragraph 17's remaining allegations.**

18.    Detective Matthew Burle and Officer Aaron Gaddis are employed as police officers with the SLMPD. Detective Matthew Burle deployed pepper spray against Plaintiff on September 17, 2017. Officer Gaddis arrested Plaintiff on September 17, 2017. Detective Burle and Officer Gaddis knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff. Detective Burle and Officer Gaddis are sued in their individual capacities.

**ANSWER:    Defendant admits Matthew Burle and Aaron Gaddis are employed as police officers with the division of police. Defendant denies all remaining allegations in paragraph 18.**

19.    Lieutenant Bill Kiphart is employed as a police officer with the SLMPD. Detective Lieutenant Bill Kiphart deployed pepper spray against Plaintiff on September 15, 2017 and September 17, 2017. Lieutenant Bill Kiphart knew or should have known there was no legal justification to use force against Plaintiff. Lieutenant Bill Kiphart is sued in his individual capacity.

**ANSWER:    Defendant admits Bill Kiphart is employed as police officer with the**

division of police. Defendant denies all remaining allegations in paragraph 19.

20.     There are other unidentified SLMPD officers who have not been named as defendants in this litigation who contributed to, and/or participated in, the conduct described herein. These unnamed officers arrested Plaintiff, used chemical munitions against Plaintiff, beat Plaintiff, prevented Plaintiff from leaving the area, and unlawfully arrested Plaintiff. Plaintiff has been unable to identify these officers because some of the officers removed their name tags from their uniforms in violation of guidance promulgated by the U.S. Department of Justice and standard law enforcement practices. Further, the officers wore masks concealing their faces. In violation of its policies, the City of St. Louis and SLMPD failed to properly document the arrests and the various use of force against Plaintiff and other persons arrested that evening. The City of St. Louis and SLMPD also failed to conduct an adequate investigation into the identity of the officers who were involved in the kettling incident. To this day, the City cannot identify every officer involved in the incident. But for the actions of the individual officers, the SLMPD, and the City of St. Louis, these officers could have been identified. Additionally, unidentified officers described below knew or should have known that there was no probable cause for the arrest of Plaintiff and that there was no legal justification to use force against Plaintiff.

**ANSWER:     Defendant denies paragraph 20's allegations.**

21.     Plaintiff is a resident of Illinois who was in St. Louis to attend demonstrations protesting Officer Jason Stockley's acquittal of the first-degree murder of Anthony Lamar Smith.

**ANSWER:     Defendant is without sufficient information to form a belief as to the truth of paragraph 21's allegations, and therefore denies the same.**

### FACTS

22.     On Friday, September 15, 2017, after a four-day bench trial, a Missouri Circuit Court Judge acquitted Officer Jason Stockley of the first-degree murder of Anthony Lamar Smith.

**ANSWER:      Defendant admits the allegations of paragraph 22.**

23.    Following the announcement of the Stockley Verdict, public protests began at multiple locations in St. Louis and surrounding communities.

**ANSWER:      Defendant admits paragraph 23's allegations**

24.      In response to the protests, St. Louis Metropolitan police officers amassed at several protests wearing military-like tactical dress, helmets, batons, and full-body riot shields and carrying chemicals, such as tear gas, skunk, inert smoke, pepper gas, pepper pellets, xylyl bromide, and/or similar substances (collectively, "chemical agents").

**ANSWER:      Defendant admits that, in response to threats of civil disorder, police officers were deployed at various locations, but Defendant denies that all such officers were fully equipped with riot gear or chemical agents; Defendant denies all other allegations of paragraph 24.**

25.      This is in stark contrast to SLMPD's appearance at a multitude of other un-permitted protests where the police themselves are not the target of the protest, including an anti-Donald Trump march on November 13, 2016, the St. Louis Women's March on January 21, 2017, the St. Louis LGBTQIA March and Rally on February 22, 2017, and the St. Louis March for Science on April 22, 2017.

**ANSWER:      Defendant denies paragraph 25's allegations.**

26.    The vast majority of protestors and protestor activity were non-violent and confined to peaceful marching and chanting.

**ANSWER:      Defendant denies paragraph 26's allegations.**

27.    During the Stockley protests, SLMPD police officers *without warning* deployed chemical agents against individuals observing, recording, or participating in protest activity, including but not limited to the following:

a.      The afternoon of Friday, September 15, 2017, near the intersection of Clark and Tucker Avenues.

b.      The evening of Friday, September 15, 2017, near the intersection of McPherson and Euclid Avenues.

c.      The evening of Friday, September 15, 2017, near the intersection of Waterman and Kingshighway Boulevards.

d.      The evening of Friday, September 15, 2017, near the intersection of Lindell and Euclid Avenues.

e.      The evening of Friday, September 15, 2017, near the intersection of Euclid and Maryland Avenues.

f.      The evening of Friday, September 15, 2017, near the intersection of Lindell and Kingshighway Boulevards.

g.      The evening of Friday, September 15, 2017, near the intersection of Euclid Avenue and Pershing Place.

h.      The evening of Friday, September 15, 2017, on Hortense Place.

i.      The evening of Sunday, September 17, 2017, near the intersection of Tucker Boulevard and Washington Avenue.

j.      The evening of September 29, 2017 outside of Busch Stadium.

**ANSWER:      Defendant admits that in responding to illegal conduct by persons engaged in disorderly protest and other group actions in September 2017 in the City of St. Louis, some police officers utilized chemical agents in a reasonable and lawful manner; Defendant otherwise denies each and every allegation of paragraph 27 and each subparagraph thereof.**

28. These incidents are consistent with the pattern and practice of SLMPD of

indiscriminately using chemical agents without warning.

**ANSWER:** **Defendant denies paragraph 28's allegations.**

29.    In October 2014, SLMPD fired chemical agents at protestors on South Grand.

**ANSWER:** **Defendant denies paragraph 29's allegations.**

30.    In November 2014, SLMPD officers fired chemical agents at protestors on South Grand as well as into a business where peaceful protestors had congregated. SLMPD officers refused to allow the protestors to leave.

**ANSWER:** **Defendant denies paragraph 30's allegations.**

31.    On December 11, 2014, a federal judge in this District issued a temporary restraining order enjoining the SLMPD from enforcing any rule, policy, or practice that grants law enforcement officials the authority or discretion to:

> (1)    utilize tear gas, inert smoke, pepper gas, or other chemical agents (collectively, "chemical agents") for the purpose of dispersing groups of individuals who are engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis
>
> (a)    without first issuing clear and unambiguous warnings that such chemical agents will be utilized;
> (b)    without providing the individuals sufficient opportunity to heed the warnings and exit the area;
> (c)    without minimizing the impact of such chemical agents on individuals who are complying with lawful law enforcement commands; and
> (d)    without ensuring that there is a means of safe egress from the area that is available to the individuals; and
>
>
> (2)    utilize chemical agents on individuals engaged in peaceful, non-criminal activity in the City of St. Louis or in the County of St. Louis for the purpose of frightening them or punishing them for exercising their constitutional rights.

*See* Exh. B, Temporary Restraining Order in *Templeton v. Dotson*, 2015 WL 13650910, No. 4:14-cv-02019 at *3 (E.D. Mo. Dec. 11, 2014).

**ANSWER:** **Defendant admits that an order was entered as reflected in Exhibit B and that a portion of that order is quoted in paragraph 31; Defendant denies all other**

**allegations of paragraph 31.**

32.    This suit was in response to SLMPD firing chemical agents into a business where

peaceful protestors had congregated without allowing the protestors to leave.

**ANSWER:    Defendant denies paragraph 32's allegations.**

33.    The City entered into a settlement agreement on March 25, 2015, where it agreed

as follows:

A**.**    Defendant and their agents, servants, employees, and representatives, will
not enforce any rule, policy, or practice that grants law enforcement officials the
authority or discretion to:

(1)    utilize tear gas, inert smoke, pepper gas, or other chemical agents
(collectively, "chemical agents") for the purpose of dispersing groups
of individuals who are engaged in non-criminal activity:

(a)    without first issuing clear and unambiguous warnings that such
chemical agents will be utilized;
(b)    without providing the individuals sufficient opportunity to heed the
warnings and exit the area;
(c)    without reasonably attempting to minimize the impact of such
chemical agents on individuals who are complying with lawful law
enforcement commands; and
(d)    without ensuring that there is a means of safe egress from the area
that is available to the individuals and announcing this means of egress to
the group of individuals.

(2)    utilize chemical agents on individuals engaged in non-criminal activity
for the purpose of frightening them or punishing them for exercising
their constitutional rights.

B.    Provided, however, that Paragraph A hereof shall not be applicable to
situations that turn violent and persons at the scene present an imminent threat of
bodily harm to persons or damage to property, and when law enforcement officials
must defend themselves or other persons or property against such imminent threat.

*See* Exh. C, Settlement Agreement in *Templeton v. Dotson*, No. 4:14-cv-02019 (E.D. Mo.

Mar. 25, 2015) at 1-2.

**ANSWER:    Defendant admit that the City of St. Louis entered into a consent**

**decree in settlement of claims in the case styled *Templeton v. Dotson, et al.*, as reflected in**

**Exhibit C and that a portion of the consent decree is quoted in paragraph 33; Defendant object to allegations pertaining to a settlement agreement as a basis for a complaint and Defendant denies all other allegations of paragraph 33.**

34.     Less than two months after entering into this Consent Decree, SLMPD began to violate the Decree.

**ANSWER:     Defendant denies paragraph 34's allegations.**

35.     On May 19, 2015, in response to protests over the St. Louis Circuit Attorney's office's refusal to charge another SLMPD officer for killing another African-American man, SLMPD officers deployed chemical agents against peaceful, non-criminal protestors without warning.

**ANSWER:     Defendant denies paragraph 35's allegations.**

36.     On August 19, 2015, a protest occurred because SLMPD officers killed another African-American man in the Fountain Park neighborhood. SLMPD officers indiscriminately used chemical agents without giving an audible and intelligible warning at the intersection of Walton Avenue and Page Boulevard. Sarah Molina testified that SLMPD officers fired chemical agents at her without giving her an opportunity to leave. SLMPD officers continued using chemical agents against people fleeing the area and even fired chemical agents at people peacefully standing on or in their own properties. Thirty minutes after the protests had dissipated, SLMPD officers returned and fired chemical agents at Ms. Molina, who was standing on property that she owns.

**ANSWER:     Defendant denies paragraph 36's allegations.**

37.      On July 21, 2017, SLMPD officers used chemical agents against people protesting the treatment of detainees in the St. Louis City Workhouse. Although a few people did engage in unlawful activity earlier in the night, SLMPD officers pepper sprayed numerous people, none of whom were involved in criminal activity or were even at the same location as the criminal activity.

These protesters were engaged in non-violent protesting when SLMPD officers sprayed them with chemical agents.

**ANSWER:**    **Defendant admit that a group of violent persons attempted to invade the premises of a correctional facility known as the Medium Security Institution of the City of St. Louis in July 2017, and that reasonable and lawful measures were taken by police officers to protect themselves and the facility; Defendant otherwise denies the allegations of paragraph 37.**

38.    Defendants' action in the instant matter follows the same script whereby SLMPD officers violate the Constitutional rights of people expressing their First Amendment right to protest against the police. Defendant' pattern and practice of illegally arresting and using chemical munitions against peaceful citizens is not only well documented but is detailed in *Ahmad* and *Templeton*.

**ANSWER:**    **Defendant denies paragraph 38's allegations.**

39.    This pattern and practice of utilizing chemical agents on individuals engaged in peaceful, non-criminal activity continued on September 17, 2017.

**ANSWER:**    **Defendant denies paragraph 39's allegations.**

40.    According to testimony Defendant Rossomanno gave in federal court, on September 17, 2017, between 8:00 PM and 9:00 PM, a handful of individuals broke windows and destroyed flowerpots on the 900, 1000, and 1100 blocks of Olive Street in downtown St. Louis.

**ANSWER:**    **Defendant admit at various points on September 17, 2017 individuals engaged in various forms of property damage. Defendant denies the remaining allegations in paragraph 40.**

41.    At the time of this incident, the SLMPD arrested numerous individuals for his vandalism.

**ANSWER:     Defendant denies paragraph 41's allegations.**

42.     There is no evidence nor allegations that Plaintiff was in any way involved in this destruction of property.

**ANSWER:     Defendant denies paragraph 42's allegations.**

43.     Plaintiff is not aware of any evidence that any person arrested during the kettle was in any way involved in the destruction of property.

**ANSWER:     Defendant is without sufficient information to form a belief as to what the Plaintiff is aware of, and therefore denies paragraph 43's allegations.**

44.     Defendant Leyshock was the incident commander directing all of the supervisors including the other named Defendant.

**ANSWER:     Defendant admits that Defendant Leyshock was the incident commander on September 17, 2017. Defendant denies paragraph 44's allegations.**

45.     Defendant Sachs was in direct command of the officers in tactical gear.

**ANSWER:     Defendant denies paragraph 45's allegations.**

46.     At approximately 8:48 PM the small number of protestors present at the time were ordered to disperse and could "be subject to arrest and/or chemical munitions."

**ANSWER:     Defendant admit protestors were given repeated dispersal orders and warned of the possibility of arrests and chemical munitions. Defendant otherwise denies paragraph 46's allegations.**

47.     A second dispersal order was given at 8:51 PM.

**ANSWER:     Defendant admit protestors were given repeated dispersal orders and warned of the possibility of arrests and chemical munitions. Defendant otherwise denies paragraph 47's allegations.**

48.     Defendant Rossomanno and Jemerson directed people to the intersection of

Washington and Tucker, where the Defendant had already decided that they would kettle, pepper spray, beat, and illegally arrest Plaintiff.

  **ANSWER:** **Defendant denies paragraph 48's allegations.**

49. These dispersal orders could not be heard or understood by other police officers, let alone civilians in the area. In testimony given later in federal court, Defendant Sachs testified that he heard some sort of order being given, but that he could not make out "exactly what was being said."

  **ANSWER:** **Defendant denies paragraph 49's allegations.**

50. Over the next two plus hours, SLMPD officers began blocking roads and directing civilians to the intersection of Washington Avenue and Tucker Boulevard.

  **ANSWER**: **Defendant admit that on September 17, 2017 officers blocked certain roads downtown. Defendant otherwise denies the allegations of paragraph 50.**

51. Defendant Karnowski and the officers under his command began to "push (the protestors) north" toward Washington Avenue and Tucker Boulevard. He also testified that he determined that the protest that evening was an "unlawful assembly."

  **ANSWER: Defendant admit that on the evening of September 17, 2017 an unlawful assembly was occurring in the vicinity of Washington and Tucker. Defendant otherwise denies paragraph 51's allegations.**

52. This area is home to many condominiums, apartment buildings, and businesses, including restaurants and bars.

  **ANSWER: Defendant admit paragraph 52's allegations.**

53. Defendant Sachs came up with the plan to arrest everyone present. He presented his plan to Defendant Leyshock, who approved the plan. The plan was to not let anyone leave that was in the vicinity of Washington Avenue and Tucker Boulevard.

  **ANSWER:** **Defendant admits that probable cause existed to arrest persons at**

16

**Tucker and Washington and that defendant Leyshock and Sachs took measures to prepare to arrest persons who did not disperse in accordance with repeated orders; otherwise denied.**

54. Defendant Leyshock, Sachs, Rossomanno, and Jemerson knew or should have known that their plan to kettle the people that SLMPD directed to the intersection of Washington and Tucker and arrest them, merely for being present, would result in arrests without probable cause and the unjustified use of force to effectuate said arrests.

**ANSWER:    Defendant denies paragraph 54's allegations.**

55.    At approximately 11:15 PM or 11:20 PM, SLMPD officers began forming into lines.

**ANSWER:    Defendant admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant otherwise denies paragraph 55's allegations.**

56.    This was nearly three hours after the windows and flower pots were broken and many blocks away from the damaged businesses.

**ANSWER:    Defendant denies paragraph 56's allegations.**

57.    SLMPD's Civil Disobedience Team appeared at the scene.

**ANSWER:    Defendant admit paragraph 57's allegations.**

58.    According to the Civil Disobedience Response Operations Plan created by the SLMPD, the Civil Disobedience Team was broken down into South, Central and North Patrols, each further broken down into Alpha, Bravo, Charlie, Delta squads and arrest teams ("CDT Squads").

**ANSWER:    Defendant admit that is the general organization of the CDT teams.**

59. In addition to the CDT Squads, officers from the Bicycle Response Team, Mobile Reserve - SWAT and Special Operations Unit actively participated in the kettling, arrests, and uses

of force on Plaintiffs and other citizens at the corner of Tucker and Washington.

**ANSWER:     Defendant denies paragraph 59's allegations.**

60. As identified in the Civil Disobedience Response Operations Plan, the police report of the incident, and the videos taken by the City, each Supervisor Officer is a supervisor of one of the participating CDT Squads, Bicycle Response Team, Special Operations team or Mobile Reserve – SWAT team.

**ANSWER:     Defendant denies paragraph 60's allegations.**

61. The Supervisor Officers were an integral part of the kettling and subsequent use of excessive force because they directed their subordinates to participate in the kettle and unlawfully seize Plaintiff and the other citizens arrested that night.

**ANSWER:     Paragraph 61 contains argumentative statements and legal conclusions rather than allegations of fact. To the extent a response is required, denied.**

62. A line of officers extended across all of the street and sidewalk on Washington Avenue one block west of Tucker Boulevard.

**ANSWER:     Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant otherwise denies paragraph 62's allegations.**

63. A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block north of Washington Avenue.

**ANSWER**:     **Defendant admit police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant otherwise denies paragraph 63's allegations.**

64. A line of officers extended across all of the street and sidewalk on Tucker Boulevard one block south of Washington Avenue.

**ANSWER**:     **Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant otherwise denies paragraph 64's allegations.**

65. All three of these lines were comprised of officers all wearing military-like tactical dress, including helmets. These officers were carrying long wooden batons and full-body riot shields.

**ANSWER**:     **Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant otherwise denies paragraph 65's allegations.**

66. A fourth line of extended across all of the street and sidewalk on Washington Avenue one half block east of Tucker Boulevard.

**ANSWER**:     **Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant otherwise denies paragraph 66's allegations.**

67. Each of the four lines began to approach the intersection of Washington Avenue and Tucker Boulevard.

**ANSWER**:     **Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant otherwise denies paragraph 67's allegations.**

68. Without further instruction or warning, SLMPD officers surrounded Downtown residents, business patrons, protestors, observers, and members of the press, cutting off all routes of egress - including via any sidewalk - and prohibiting the people trapped inside from leaving.

**ANSWER:     Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant admits that probable cause existed to arrest persons at Tucker and Washington**

and some such persons were arrested on probable cause on September 17, 2017. Defendant otherwise denies paragraph 68's allegations.

69.      As they approached, the SLMPD police officers began banging batons against their riot shields and the street in unison causing a foreboding and terrifying sound, akin to a war march.

**ANSWER: Defendant denies paragraph 69's allegations.**

70.      As the SLMPD police officers began to close in on the citizens that SLMPD had forced into the intersection of Washington Avenue and Tucker Boulevard, the officers blocked anyone from leaving the area.

**ANSWER: Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant admits that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendant otherwise denies paragraph 70's allegations.**

71. Multiple citizens approached officers and requesting to be let past. These peaceful and lawful requests were not only ignored but responded to by screams of "get back!"

**ANSWER:      Defendant denies paragraph 71's allegations.**

72. In addition, the closing phalanxes of officers cut off access to all alleys and other means of egress.

**ANSWER: Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant admit that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendant otherwise denies paragraph 72's allegations.**

73. As the four lines closed, they trapped everyone who was within a one-block radius of the

intersection of Washington Avenue and Tucker Boulevard.

**ANSWER: Defendant admits police officers formed lines in the vicinity of Washington and Tucker at various times throughout the evening on September 17, 2017. Defendant admit that probable cause existed to arrest persons at Tucker and Washington and some such persons were arrested on probable cause on September 17, 2017. Defendant otherwise denies paragraph 73's allegations.**

74. This is a law enforcement tactic known as "kettling."

**ANSWER;   Defendant denies paragraph 74's allegations.**

75. The SLMPD police officers kettled a wide variety of innocent citizens, including self-admitted protestors, residents who merely lived in the area, people visiting businesses in the area, reporters, documentarians, and homeless persons.

**ANSWER:   Defendant denies paragraph 75.**

76. The officers even grabbed an African-American male who was outside of the kettle and threw him into the kettle.

**ANSWER:   Defendant denies paragraph 76.**

77. As the kettle closed, many individuals approached the officers and begged to pass.

**ANSWER:   Defendant denies paragraph 77.**

78. Not surprisingly, the individuals in the kettle gravitated toward the line of bicycle officers rather than three lines of police in military gear, who were banging wooden batons against their riot shields.

**ANSWER:   Defendant is without sufficient knowledge to form a belief as to the truth of paragraph 78's allegations, and therefore denies the same.**

79. Individuals peacefully approached the bicycle officers with their hands up.

**ANSWER:   Defendant denies paragraph 79's allegations.**

80. In response, the bicycle officers began to aggressively jab at the individuals using their bicycles as battering rams.

**ANSWER:    Defendant denies paragraph 80.**

81. The Supervisor Officers were directing these officers.

**ANSWER:    Defendant denies paragraph 81.**

82. Rather than defuse the situation, many of the Supervisor Officers directed the officers under their command to use force against the peacefully assembled people and supervised the unlawful arrests. The other Supervisor Officers made no attempt to stop the illegal use of force and the unlawful arrests.

**ANSWER:    Defendant denies paragraph 82.**

83. Some Supervisor Officers, including Defendant Karnowski, Aubuchon, and Kiphart actively engaged in the use of excessive force by arbitrarily and unconstitutionally pepper spraying peaceful citizens who were in compliance with police orders, to the extent they were even given. Their actions caused Plaintiff to experience chaos, fear and terror.

**ANSWER:    Defendant denies paragraph 83.**

84. Those other Supervisor Officers that did not actually deploy pepper spray or put their hands on citizens still stood and watched as others did use excessive force and failed to intervene despite having the authority and opportunity to do so.

**ANSWER:    Defendant denies paragraph 84.**

85. Some of the Supervisor Officers, including Defendant Karnowski, Aubuchon, Kiphart, and Long, actively engaged in the unconstitutional use of pepper spray on innocent civilians. The others stood by and watched as civilians, including Plaintiff, were unconstitutionally arrested, beaten, pepper-sprayed, and failed to intervene in the violation of Plaintiff's civil rights.

**ANSWER:    Defendant denies paragraph 85.**

86. At the very beginning of the kettle, a few people caught in the crowd peacefully stood with their hands up in front of the line of officers, trying to understand what was happening. Defendant Karnowski instigated the violent attacks against the innocent citizens when he unleashed pepper spray against several citizens who were peacefully standing still with their hands up. At no time was Defendant Karnowski in any danger as he was safely standing with a line of bicycle officers between him and the citizens. All of his illegal actions were documented on a video camera strapped to his helmet.

**ANSWER:      Defendant denies paragraph 86.**

87. Almost immediately after, Defendant Aubuchon followed suit and indiscriminately sprayed numerous innocent civilians.

**ANSWER:      Defendant denies paragraph 87.**

88. The use of excessive force at the outset of the arrest by a lieutenant and sergeant was tacit approval to the other officers to engage in the same unconstitutional behavior. Their behavior resulted in a domino effect of excessive force and unconstitutional behavior on Plaintiff and the others arrested that evening.

**ANSWER:      Defendant denies paragraph 88.**

89. Almost instantly and in unison, the other individuals in the kettle put their hands in the air as a sign of peaceful surrender.

**ANSWER:      Defendant denies paragraph 89.**

90. Many laid prostrate on the ground. Others sat down. And others, who could not fully get to the ground because of the mass of people inside of the kettle, got as close to the ground as possible.

**ANSWER:      Defendant denies paragraph 90.**

91. Even though video evidence shows that none of the individuals inside the kettle were

acting violently or aggressively, the individuals in the kettle were indiscriminately and repeatedly doused with chemical agents without warning.

**ANSWER:      Defendant denies paragraph 91.**

92. One of the Supervisor Officers, Defendant Kiphart, viciously attacked a journalist with a camera with pepper spray from a "fogger" which also sprayed indiscriminately into the crowd. Moments later, Detective Matthew Burle deployed another fogger blast towards the same journalist and those sitting near him with more pepper spray in the face, yet another concrete example of a subordinate officer taking a cue from a Supervisor Officer to engage in unconstitutional excessive force.

**ANSWER:      Defendant denies paragraph 92.**

93. Many of the persons arrested were kicked, beaten, and dragged.

**ANSWER:      Defendant denies paragraph 93.**

94. Some individuals caught in the kettle had been wearing goggles because they feared the deployment of chemical agents, based on the SLMPD's well known pattern and practice of using chemical agents against peaceful protestors.

**ANSWER:      Defendant admits individuals were wore masks and goggles concealing their identities. Defendant otherwise denies paragraph 94's allegations.**

95. Others found paper masks on the ground or other objects in order to protect themselves as it became apparent that SLMPD was preparing to effectuate illegal and likely violent arrests.

**ANSWER:      Defendant admits individuals were wore masks and goggles concealing their identities. Defendant otherwise denies paragraph 95's allegations.**

96. In response, SLMPD officers roughly removed the goggles of some individuals and then sprayed them directly in the face.

**ANSWER:      Defendant denies paragraph 96's allegations.**

97. At the same time, SLMPD officers screamed derogatory and homophobic epithets at individuals as they were being arrested.

**ANSWER:      Defendant denies paragraph 97's allegations.**

98. These punitive measures were delivered without regard to the fact that the individuals were peaceful and compliant.

**ANSWER:      Defendant denies paragraph 98's allegations.**

99. Defendant Jemerson, Rossomanno, and the Supervisor Officers were within arms length of SLMPD officers who were pepper spraying and beating peaceful and compliant citizens. Rather than instructing these officers to cease violating the civil right of the citizens, these Defendant took control of the situation and directed the officers' unlawful actions.

**ANSWER:      Defendant denies paragraph 99's allegations.**

100. SLMPD officers used hard plastic zip ties to arrest all of the individuals. Over two months later, several continue to suffer from pain and numbness in their hands due to the tightness of the zip ties.

**ANSWER: Defendant admits some plastic zip tie handcuffs were used in an appropriate manner. Defendant otherwise denies paragraph 100's allegations.**

101. Over 100 people were arrested that night.

**ANSWER:      Defendant admits paragraph 101's allegations.**

102. During and after the arrests, SLMPD officers were observed high fiving each other, smoking celebratory cigars, taking selfies on their personal phones with arrestees against the arrestees will, and chanting "Whose Streets? Our Streets!"

**ANSWER: Defendant admits some chanting occurred for which officers were later reprimanded. Defendant otherwise denies the allegations of paragraph 102.**

103. That evening, the following celebratory picture was posted on Twitter by an anonymous person:



**ANSWER:   Defendant admit the photo was posted by an anonymous person. Defendant otherwise denies the allegations of paragraph 103.**

104. By the coordinated actions of the officers in circling the assembly into the kettle and the systematic disbursement of the chemical agents, it is clear that these tactics were planned and that senior officials of the SLMPD not only had notice of but actually sanctioned the conduct of Defendant.

**ANSWER:   Defendant denies paragraph 104's allegations.**

105. Defendant' actions did not occur randomly. Rather, Defendant decided beforehand that they would make an example of the arrestees in an attempt to scare other citizens from exercising their First Amendment rights to protest against the SLMPD's actions.

**ANSWER:   Defendant denies paragraph 105's allegations**

106. SLMPD officers specifically hid their identity from observers and citizen arrestees

including Plaintiffs by obscuring their identities the night of the incident, and by intentionally failing to record which officers seized or interacted with which arrestee. The officers hid their identity in order to scare and intimidate observers, terrorize the citizen arrestees, avoid any department accountability, avoid any civil or criminal legal responsibility, and to help fellow officers avoid identifying wrongdoers following the incidents.

> **ANSWER:** **Defendant denies paragraph 106's allegations.**

107. The next day, the SLMPD Acting Chief reinforced the City's ratification of the Defendant' actions when he said, "I'm proud to say the city of St. Louis and the police owned the night," while standing next to Saint Louis Mayor Lyda Krewson.

> **ANSWER:** **Defendant denies paragraph 107's allegations.**

108. The day after the arrests, Mayor Krewson further validated the illegal actions of Defendant when she thanked the officers "for the outstanding job they have been doing over the last three days." She added that she fully supported the actions of the officers.

> **ANSWER:** **Defendant admits that St. Louis police properly enforced the law during the period in question. Defendant otherwise denies the allegations in paragraph 108.**

109. Since then, the U.S. Attorney's Office brought indictments in federal court against 5 SLMPD Officers on the Civil Disobedience Team for the beating of an undercover police officer on September 17, 2017. Emails quoted in the indictment show that the officers were informed ahead of time that they would be deployed wearing military-like tactical dress to conceal their identities in order to beat protestors. This is exactly what occurred to Plaintiff, under the direct supervision and control of Defendant Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno.

> **ANSWER:** **Defendant admit certain officers have been indicted for unauthorized**

**illegal activity. These officers are in the process of being disciplined. Defendant otherwise**

**denies the allegations in paragraph 109.**

110. The indictment quoted text messages sent to and from the defendant officers regarding the mass arrest on September 17, 2017, that prove the vicious and unlawful intent of the officers and belie any post hoc justification for the kettling, use of chemical agents, excessive force, and arrests:

a. "The more the merrier!!! It's gonna get IGNORANT tonight!! But it's gonna be a of lot of fun beating the hell out of these shitheads once the sun goes down and nobody can tell us apart!!!!"

b. "R u guys in [South Patrol Division] prepping anything for the war tonight?"

c. "We reloading these fools up on prisoner busses. As they got on we all said in unison 'OUR STREETS' haha."

d. "Yeah. A lot of cops gettin hurt, but it's still a blast beating people that deserve it. And I'm not one of the people hurt, so I'm still enjoying each night."

e. "The problem is when they start acting like fools, we start beating the shit out of everyone on the street after we give two warnings."

f. "I'm on (Sgt **'s) arrest team! Me and a BIG OL black dude r the guys that are hands on! No stick or shield… just (expletive) people up when they don't act right! …"

G. The Police Department intentionally ignored its own policies.

**ANSWER:     Defendant admits certain officers have been indicted for**

**unauthorized illegal activity. These officers are in the process of being disciplined.**

**Defendant otherwise denies the allegations in paragraph 110.**

111. When detaining individuals in custody who require medical care, the City of St.

Louis and its SLMPD has established the following policy:

PRISONERS REQUIRING MEDICAL ATTENTION (72.6.1)

1. A medical emergency is defined as a condition which a reasonable person would expect a result in loss of life or function. Examples of medical emergencies include severe bleeding, fractures with displacement (bone out of alignment), loss of consciousness, non-responsiveness, and respiratory distress, severe chest pain or severe shortness of breath. This list is not all-inclusive. If you have any doubts, contact the on-duty nurse at the City Justice Center for guidance.

2. Should a prisoner require emergency medical attention, whether the injury or illness occurred during incarceration or not, an Emergency Medical Service (EMS) unit will be requested to respond to the holdover for medical evaluation and if necessary conveyance to the hospital. EMS will determine the destination hospital. An I/LEADS report will be prepared documenting all treatment received by the prisoner. If immediate first aid is administered by a Department employee or the paramedics, the injury and treatment will be noted in the Prisoner's Log Book by the booking clerk.

3. Should a prisoner require non-emergency medical attention, the on-duty nurse at the City Justice Center will be contacted for guidance.

4. The confidential relationship of doctor and patient extends to prisoner patients and their physician.

5. In the event a prisoner is injured while in custody or shortly before being taken into custody, the Watch Commander will arrange to have photographs taken of any and all visible injuries. The photographs will be treated as physical evidence. If practical, the photos should be taken both prior to the application of bandages,

etc., and after the injury has received appropriate medical attention

PRISONER HEALTH SCREENING (72.6.3)

The following prisoner medical "receiving screening" information will be obtained and recorded

on the Field Booking Form when prisoners are booked and verified upon their transfer to

another facility or release:

> 1. Current health and medical history of the prisoner; (72.6.3.a)
>
> 2. Medication taken by the prisoner; (72.6.3.b)
>
> 3. Known medication/drug allergies;
>
> 4. Behavior, including state of consciousness and mental status; and (72.6.3.c) 5. Body
>
>    deformities, trauma markings, bruises, lesions, jaundice (a yellowness of the skin and
>
>    whites of the eyes), and ease of movement (72.6.3.d)

NOTE: a copy of the Field Booking Form **must** be attached to the computerized Arrest

Register whenever a prisoner is transferred to the City Justice Center.

**ANSWER: Defendant admits paragraph 111's allegations.**

112. On information and belief, the SLMPD and City of St. Louis Correctional Staff failed

and/or refused to follow this policy when they provided no medical care to any of the people

illegally pepper sprayed.

**ANSWER:    Defendant denies paragraph 112's allegations.**

113. Defendant' decision to ignore the policy constitutes a custom and practice of failing

and/or refusing to follow this policy designed to protect the safety and wellbeing of injured

individuals in police custody, showing a deliberate indifference by Defendant to the rights of

Plaintiffs and other injured detainees.

**ANSWER:    Defendant denies paragraph 113's allegations.**

114. Despite this policy, at no time between their arrest and their release from the St. Louis

City Justice Center did any police officer or other city official provide any arrestee with medical care or give anything to them to wash the chemical agents out of their eyes, off their bodies, or off their clothes.

> **ANSWER:    Defendant denies paragraph 114's allegations.**

115. Upon their release, all of the arrestees were given summonses showing that they had been charged with "failure to disperse." They were instructed to appear at St. Louis City Municipal Court on October 18, 2017.

> **ANSWER:    Defendant is without sufficient knowledge or information to form a belief as to the truth of paragraph 115's allegations and therefore denies the same.**

116. They were charged as such even though SLMPD officers provided no means of egress, denied repeated requests to be allowed to leave, and kettled the individuals.

> **ANSWER:    Defendant denies paragraph 116's allegations.**

117. In at least one case, a person was thrown from outside of the kettle into the kettle by SLMPD and was subsequently arrested for failure to disperse.

> **ANSWER:    Defendant denies paragraph 117's allegations.**

118. The press release stated "[m]any of the demonstrators were peaceful, however after dark, the agitators outnumbered the peaceful demonstrators and the unruly crowd became a mob. Multiple businesses also sustained property damage and one officer suffered a serious injury."

> **ANSWER:    Defendant admits paragraph 118's allegations.**

119. Egregiously and in an attempt to further punish its victims, SLMPD publicly released the addresses of the arrestees.

> **ANSWER:    Defendant denies paragraph 119's allegations.**

120. The video evidence, as the federal court observed, "shows no credible threat of force or violence to officers or property in this mixed commercial and residential area" – much less a

mob. SLMPD also fails to mention that the "one officer who suffered a serious injury" was an undercover officer who was pepper sprayed and beaten by SLMPD.

> **ANSWER:** **Defendant denies paragraph 120's allegations.**

121. SLMPD used its Twitter account to disseminate this false statement to its approximately 70,000 followers. SLMPD subsequently deleted the tweet.

> **ANSWER:** **Defendant denies paragraph 121's allegations.**

122. During a preliminary injunction hearing, attorneys representing the City stated that it was the policy of the City of St. Louis that once property damage occurs, SLMPD is justified in declaring an unlawful assembly and then deploying chemical agents regardless of the proximity of the target individuals in time or space to the property damage and regardless of if the people were engaged in criminal activity. According to the City, officers are justified to use chemical agents or beat and arrest anybody merely for being close to the area, even hours after the criminal activity has occurred.

> **ANSWER:** **Defendant denies paragraph 122's allegations.**

123. On October 13, 2017, the St. Louis City Counselor's office issued a letter stating "[a]s of today, the City Counselor is still reviewing the evidence against you in order to decide whether or not to file charges and it is not anticipated that this decision will be made prior to October 18, 2017. Therefore, you are released from any obligation to appear in Municipal Court on October 18, 2017, in connection with the offense being considered. After a review of the matter is completed, should a decision be made to file charges against you, you will be notified by mail of that decision and advised when and where to appear to defend against those charges."

> **ANSWER:** **Defendant admits paragraph 123's allegations.**

124. On November 15, 2017, a judge in this District barred SLMPD from using many of the tactics described in this complaint. *See* Doc. 58, Memorandum and Order of Preliminary Injunction,

*Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017).

**ANSWER:**   **Defendant admits that an order was entered by the Court in the case referenced above. Defendant otherwise denies paragraph 124's allegations.**

125. The Court found that "[p]rotest activity began shortly after the announcement of the verdict on the morning of September 15, 2017. Protesters assembled in front of the state courthouse downtown near Tucker and Market streets. They did not have a permit to protest because the City of St. Louis does not require, and will not provide, a permit for protests." *Id.* at 2.

**ANSWER:**   **Defendant admits that paragraph 125 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of paragraph 125.**

126. The Court found that on September 17, 2017, there was some property damage downtown but Defendant Sachs "testified that he was unaware of any property damage occurring in the downtown area after 8:30 PM". *Id.* at 9.

**ANSWER:**   **Defendant admits that paragraph 126 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of this paragraph.**

127. The Court found that Defendant Rossomanno gave a dispersal order before 10:00 PM but that "this order did not specify how far protesters had to go to comply with the directive to leave the area." *Id.* at 8. The Court noted that Defendant Sachs "could not say 'exactly how far would be enough' to comply with this, or any, dispersal order." *Id.* at 8-9.

**ANSWER:**   **Defendant admits that paragraph 126 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of this paragraph.**

128. The Court found that Defendant Sachs "testified that around 10:00 PM the decision

was made to make a mass arrest of people remaining in the area of Tucker and Washington, which is three or four blocks away from where the earlier dispersal order was given." *Id.* at 9. Yet, SLMPD continued to "freely allowed people ingress into the area after the initial dispersal order was given." *Id.* at 11.

**ANSWER:** **Defendant admits that paragraph 128 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of this paragraph.**

129. The last known dispersal order was given approximately 45 minutes before the mass arrests began but approximately 45 after SLMPD made the decision to conduct a mass arrest. This final dispersal order was once again given approximately two blocks south of the intersection of Washington and Tucker. The dispersal order was "You are being ordered to disperse from the area of Locst and Tucker by walking north on Tucker or west on Locust." Rather than being a legitimate order, this was a trap. By complying with the order and moving north on Tucker as directed by police, the citizens were forced to the intersection of Washington and Tucker, which SLMPD had already disgnated as the mass arrest location. Even though the citizens complied with the order, they were arrested for failure to comply.

**ANSWER:** **Defendant denies this paragraph's allegations.**

130. The Court found that at approximately 11:30 PM SLMPD began a mass arrest of everyone in the vicinity even though video evidence presented to the Court "does not shows a large crowd congregating in the streets" and "[n]o violent activity by protesters can be observed on the video." *See* Doc. 58 at 10, Memorandum and Order of Preliminary Injunction, *Ahmad v. St. Louis*, No. 4:17-cv-02455 (E.D. Mo. Nov. 15, 2017). In fact, the "scene appears calm and most people appear relaxed." *Id.* at 10-11. The only signs of disobedience seen on the video are "four to five individuals" sitting on Tucker Avenue, which was closed, and a small group of people yelling at the

police. *Id.* at 10.

**ANSWER:    Defendant admits that paragraph 130 accurately quotes from the order referenced, but Defendant denies all other allegations and conclusions of this paragraph.**

131. The video was taken from approximately 10:45 PM to the time of the arrests at 11:30 PM *Id.* at 12.

**ANSWER:    Defendant is without sufficient knowledge and information to admit the allegations of paragraph 131.**

132. The video "shows an unidentified officer walking around with a hand-held fogger shooting pepper spray at the arrestees, who all appear to be on the ground and complying with police commands. This officer issues no verbal commands to any arrestee, and no arrestee on the video appears to be resisting arrest. The video shows other officers shouting at people on the ground and making threatening gestures at them with mace. An unidentified (person) lying face down on the ground is picked up by his feet by two officers and dragged across the pavement." *Id.* at 15-16.

**ANSWER:    Defendant admits that paragraph 132 quotes from the order referenced, but Defendant denies all other allegations and conclusions of paragraph 132.**

133. In an attempt to defend the SLMPD's actions, the City's attorney "stated during closing arguments that 'the police have the right to tell people, at this point, we're done for the evening; there's no – no more assembling; this assembly is over.'" *Id.* at 37. Not surprisingly, the Court did not adopt this rationale as a basis for the arrests and the use of chemical agents.

**ANSWER:    Defendant admits that paragraph 133 quotes from the order referenced, but Defendant denies all other allegations and conclusions of paragraph 133.**

134. The Court made the following findings:

   a. Plaintiffs are likely to prevail on the merits of their claims that the policies or

customs of defendant discussed below violate the constitutional rights of plaintiffs. *Id.* at 35-36.

b. Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit any officer to declare an unlawful assembly in the absence of the force or violence requirement of St. Louis City Ordinance 17.16.275 and Mo. Rev. Stat. § 574.060, in violation of plaintiffs' First and Fourth Amendment rights. *Id.* at 36.

c. Plaintiffs' evidence of the activities in the Washington and Tucker intersection on September 17, 2017, **shows no credible threat of force or violence to officers or property in this mixed commercial and residential area**. *Id.* at 37. (Emphasis added).

d. Plaintiffs have presented sufficient evidence for purposes of awarding preliminary injunctive relief that defendant's custom or policy of committing discretionary authority to police officers to declare unlawful assemblies in the absence of any threat of force or violent activity provides no notice to citizens of what conduct is unlawful, and it permits officers to arbitrarily declare "there's no more assembling." *Id.* at 37-38. Plaintiffs have presented sufficient evidence at this stage of the proceedings that this discretion was in fact exercised in such a manner in violation of plaintiffs' constitutional rights. *Id.*

e. Similarly, Plaintiffs have presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant's custom or policy is to permit officers to issue vague dispersal orders to protesters exercising their first amendment rights in an arbitrary and retaliatory way and then to enforce those dispersal orders without sufficient notice and opportunity to comply before being subjected to uses of force or arrest, in violation of Plaintiffs' First and Fourth Amendment rights. *Id.* at 39.

36

f. Plaintiffs presented sufficient, credible evidence for purposes of awarding preliminary injunctive relief that defendant has a custom or policy, in the absence of exigent circumstances, of issuing dispersal orders to citizens engaged in expressive activity critical of police which are either too remote in time and/or too vaguely worded to provide citizens with sufficient notice and a reasonable opportunity to comply, inaudible and/or not repeated with sufficient frequency and/or by a sufficient number of officers to provide citizens with sufficient notice and a reasonable opportunity to comply, contradictory and inconsistent, not uniformly enforced, and retaliatory. *Id.* at 40.

g. Plaintiffs have also presented sufficient evidence demonstrating that they are likely to prevail on their claim that defendant has a custom or policy of using chemical agents without warning on citizens engaged in expressive activity that is critical of police or who are recording police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id.* at 41.

h. Plaintiffs have presented sufficient, credible testimony and video evidence from numerous witnesses that they were maced without warning in the absence of exigent circumstances while they were not engaging in violent activity and either were not in defiance of police commands (because none were given) or were complying with those commands. *Id.* at 42.

i. The City's custom or policy of authorizing the use of hand-held mace against non-violent protesters with no warning or opportunity to comply and in the absence of probable cause or exigent circumstances impermissibly circumvents the protections afforded by the *Templeton* settlement agreement and vests individual officers with unfettered discretion to exercise that authority in an arbitrary and retaliatory manner in violation of constitutional rights. *Id.* at 43-44.

j. Plaintiffs' evidence — both video and testimony — shows that officers have exercised their discretion in an arbitrary and retaliatory fashion to punish protesters for voicing criticism of police or recording police conduct. When all of the evidence is considered, plaintiffs have met their burden of showing that they are likely to succeed on their claim that defendant has a custom or policy of deploying hand held pepper spray against citizens engaged in recording police or in expressive activity critical of police in retaliation for the exercise of their first amendment rights, in violation of the First, Fourth, and Fourteenth Amendments. *Id.* at 44.

k. Plaintiffs have also presented sufficient evidence at this preliminary stage of the proceedings that the aforementioned customs or policies of defendant caused the violations of plaintiff's constitutional rights. *Id.* at 44. That is because "it is well-settled law that a loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" and "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 691 (8th Cir. 2008)(internal quotation marks and citations omitted), overruled on other grounds, *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (2012). *Id.* at 44-45.

**ANSWER:     Defendant admits that paragraph 133 quotes from the order referenced, but Defendant denies all other allegations and conclusions of paragraph 134 and each of its subparts.**

135. Upon information and belief, senior officials of the SLMPD, including Defendant Leyshock, Boyher, Sachs, Jemerson, Karnowski, and Rossomanno, were directing such actions and conduct and/or tacitly accepting and encouraging such conduct by not preventing officers from engaging in such conduct and by not disciplining them when they did engage in such actions and conduct.

**ANSWER:** **Defendant denies the allegations and conclusions of paragraph 135.**

136.     At no point since the mass arrest in September 2017 has SLMPD Internal Affairs Division done an internal investigation of any kind into the numerous citizen complaints filed following the kettling.

**ANSWER:** **Defendant denies the allegations and conclusions of paragraph 136.**

137.     On September 15, 2017, at around 1:00 P.M., Mr. Rose went to downtown St. Louis following the announcement of the verdict in the Jason Stockley case.

**ANSWER:** **Defendant is without sufficient knowledge or information to form a belief as to the truth of paragraph 137's allegations and therefore denies the same.**

138.     Mr. Rose observed that sever downtown streets had been blocked of by police, including Tucker Boulevard between Chestnut Street and Clark Street..

**ANSWER:** **Defendant is without sufficient knowledge or information to form a belief as to the truth of paragraph 138's allegations and therefore denies the same.**

139.     At 5:17 P.M., Mr. Rose used his mobile phone to record an SLMPD police officer.

**ANSWER:** **Defendant is without sufficient knowledge or information to form a belief as to the truth of paragraph 139's allegations and therefore denies the same.**

140.     Lt. Bill Kiphart noticed Mr. Rose recording and responded by blasting Mr. Rose with pepper spray.

**ANSWER:** **Defendant is without sufficient knowledge or information to form a belief as to the truth of paragraph 140's allegations and therefore denies the same.**

141.     Mr. Rose was unable to discover Lt. Kiphart's name at the time because Lt. Kiphart was not wearing a name badge. Mr. Rose captured an image of the officer just before the officer sprayed Mr. Rose.

**ANSWER:**      Defendant is without sufficient knowledge or information to form a belief as to the truth of paragraph 141's allegations and therefore denies the same.

142.      Mr. Rose heard no announcements suggesting an unlawful assembly, ordering dispersal, or warning that chemical agents might be used. Mr. Rose was not engaged in any illegal activity. Lt. Kiphart sprayed Mr. Rose to deter Mr. Rose from recording the officer.

**ANSWER:**      Defendant denies the allegations of this paragraph.

143.      After Mr. Rose was sprayed by Lt. Kiphart, MR. Rose heard Sgt. Rossomanno declare an unlawful assembly due to the assembly impeding traffic flow.

**ANSWER:**      Defendant is without sufficient knowledge or information to form a belief as to the truth of paragraph 143's allegations and therefore denies the same.

144.       Mr. Rose noted that the gathering was not impeding traffic as there was no traffic in the area due to the police blocking nearby streets. Mr. Rose inferred that the announcement was merely a pretext to begin using chemical munitions against citizens.

**ANSWER:**      Defendant denies the allegations and conclusions of paragraph 144.

145.      Mr. Rose experienced a burning sensation on his skin from the spray and decided to leave the protest and shower at a friend's home.

**ANSWER:**      Defendant is without sufficient knowledge or information to form a belief as to the truth of paragraph 145's allegations and therefore denies the same.

146.      Defendants' action in the instant matter follows the same script whereby SLMPD officers violate the Constitutional rights of people expressing their First Amendment right to protest against the police. Defendants' pattern and practice of illegally arresting and using chemical munitions against peaceful citizens is not only well documented but is detailed in *Ahmad* and *Templeton*.

**ANSWER:**      Defendant denies the allegations and conclusions of paragraph 146.

147.     On September 17, 2017 at around 9:00 P.M. Mr. Rose arrived in downtown St. Louis to document police interactions with protesters.

**ANSWER:     Defendant lacks sufficient information to form a belief as to the truth of these allegations and therefore denies the allegations of paragraph 147.**

148.     Mr. Rose observed Sgt. Rossomanno declare an unlawful assembly, order dispersal, and warn of the use of chemical munitions at Washington and Tucker at 9:28 PM.

**ANSWER:     Defendant admits that repeated dispersal orders and warnings were given throughout the evening, but otherwise denies the allegations of paragraph 148.**

149.     Sgt. Rossomanno told Mr. Rose and others to walk west on Washington Avenue.

**ANSWER:     Defendant admits that repeated dispersal orders and warnings were given throughout the evening, but otherwise denies the allegations of paragraph 148.**

150.     As Mr. Rose and others complied and walked west on Washington, they were met by officers who told the group they could not walk in that direction.

**ANSWER:     Defendant lacks sufficient information to form a belief as to the truth of these allegations and therefore denies the allegations paragraph 150.**

151.     Mr. Rose turned north on Tucker Boulevard.

**ANSWER:     Defendant lacks sufficient information to form a belief as to the truth of these allegations and therefore denies the allegations paragraph 151.**

152.     Mr. Rose heard SLMPD officers demand that the civilians stand four to five feet away from the police line.

**ANSWER:     Defendant admits that repeated instructions and warnings were given throughout the evening, but otherwise denies the allegations of paragraph 152**

153.     Mr. Rose complied with the officers' order.

      **ANSWER:**    **Defendant denies the allegation of paragraph 153.**

154.    Around 10:00 PM, the line of SLMPD officer dispersed, and the officers in riot gear left the area.

      **ANSWER:**    **Defendant admits that at some point, prior to a renewal of violent and assaultive behavior of crowds, CDT teams withdrew, but otherwise denies the allegations of paragraph 154.**

155.    Mr. Rose heard no other dispersal orders that evening.

      **ANSWER:**    **Defendant denies the allegation of paragraph 155.**

156.    Mr. Rose followed the exiting crowd south on Tucker and east on Locust Street. He then walked to the intersection of Ninth Street and Olive Street.

      **ANSWER:**    **Defendant denies the allegations and conclusions of paragraph 156.**

157.    Mr. Rose peacefully stood at Ninth and Olive from about 10:20 PM to 10:50 PM.

      **ANSWER:**    **Defendant denies the allegations and conclusions of paragraph 157.**

158.    At around 10:50 PM, Mr. Rose and a friend walked west on Olive to Tucker then north on Tucker to between St. Charles Street and Washington.

      **ANSWER:**    **Defendant lacks information to form a belief as to the truth of these allegations and therefore denies the allegations of paragraph 158.**

159.    Mr. Rose stood on the driveway along Tucker for about ten minutes and heard no announcements nor observed any illegal activity.

      **ANSWER:**    **Defendant denies the allegations of paragraph 159.**

160.    At around 11:15 PM, police in riot gear started walking toward Mr. Rose and his friend from the south, blocking Tucker and its sidewalks.

      **ANSWER:**    **Defendant is without sufficient knowledge or information to form a belief as to the truth of paragraph 160's allegations and therefore denies the**

same.

161. A second set of police officers on bicycles simultaneously blocked Washington and its sidewalks east of Tucker.

**ANSWER:     Defendant denies the allegations and conclusions of paragraph 161.**

162. A third set of police officers in riot gear blocked the street and sidewalks across Tucker north of Washington and began advancing toward Washington.

**ANSWER:     Defendant denies the allegations and conclusions of paragraph 162.**

163. A fourth set of police officers in riot gear moved east on Tucker toward Washington, trapping Mr. Rose and his friend on all four sides.

**ANSWER:     Defendant denies the allegations and conclusions of paragraph 163.**

164. Mr. Rose was approached by Sgt. Rossomanno, who told Mr. Rose that the civilians had been warned, and that now everyone present was going to jail.

**ANSWER:     Defendant admits that warnings were given during the evening and otherwise denies the allegations of paragraph 164.**

165. After the police surrounded Mr. Rose and other civilians, Mr. Rose was instructed to get on the ground. Mr. Rose saw officers order civilians present, including himself, to stop using phones to record.

**ANSWER:     Defendant denies the allegations of paragraph 165.**

166. Mr. Rose saw police officers take phones from civilians and throw the phones to the ground.

**ANSWER:     Defendant denies the allegations of paragraph 166.**

167. Mr. Rose complied with the order to get on the ground.

**ANSWER:     Defendant denies the allegations of paragraph 167.**

168. Because of the number of civilians crowded into one area, Mr. Rose was initially only

able to kneel, and any attempts he made to get lower only resulted in him getting on top of other civilians.

**ANSWER:    Defendant denies the allegations of paragraph 168.**

169. Various officers continued to scream at the seated protestors to get further down on the ground.

**ANSWER:    Defendant denies the allegations of paragraph 169.**

170. Notwithstanidng the attempts of Mr. Rose and other passive, non-resisting civilians to do just that, Lt. Kiphart doused him and others with pepper spray from a fogger (a large canister of capsaicin spray) from a distance of no more than five feet.

**ANSWER:    Defendant denies the allegations of paragraph 170.**

171. There was no warning before this spray.

**ANSWER:    Defendant denies the allegations of paragraph 171.**

172. Less than a minute later, Detective Matthew Burle doused Mr. Rose and others again, also with pepper spray from a fogger (a large canister of capaicin spray) from a distance of no more than five feet.

**ANSWER:    Defendant denies the allegations of paragraph 172.**

173. There was no warning before this spray, and no reason was given.

**ANSWER:    Defendant denies the allegations of paragraph 173.**

174. Two unidentified SLMPD officers—one of whom was a member of the SWAT detachment who arrived on the North side of the kettle—then roughly and tightly zip tied Mr. Rose.

**ANSWER:    Defendant denies the allegations of paragraph 174.**

175. Even though Mr. Rose was zip tied with his hands behind his back, a third unidentified SLMPD officer pepper sprayed him from point blank range again.

**ANSWER:**     **Defendant denies the allegations of paragraph 175.**

176. Defendant Gaddis and a fourth unidentified SLMPD officer picked Mr. Rose up by his zip-tied wrists.

**ANSWER:**     **Defendant denies the allegations of paragraph 176.**

177. Defendant Gaddis then lined Mr. Rose up against a building with other arrestees.

**ANSWER:**     **Defendant denies the allegations of paragraph 177.**

178. Another unidentified SLMPD officer patted down MR. Rose and took Mr. Rose's iphone out of his pocket.

179. This SLMPD officer then slammed the phone to ground destroying the phone.

180. While seated on ground up against the wall, Mr. Rose was approached by Lt. Boyher, who harassed Mr. Rose and threatened him by stating, "I've looked into you" and by revealing personal details of Mr. Rose's life.

**ANSWER:**     **Defendant denies the allegations and conclusions of paragraph 180.**

181. Mr. Rose was given into the custody of Officer Gaddis, who took a photo with Mr. Rose and listed himself as Mr. Rose's arresting officer.

**ANSWER:**     **Defendant admits? the allegations of paragraph 176.**

182. Mr. Rose also observed a black man being strangled with the strap of his camera by an SLMPD police officer before the police officer took the camera, viewed photographs on the camera's screen, and pushed buttons on the camera.

**ANSWER:**     **Defendant denies the allegations and conclusions of paragraph 182.**

183. Mr. Rose was then transported to the St. Louis City Justice Center where he was held for approximately 15 hours. During the entire time, Mr. Rose was in pain and felt burning from the pepper spray.

**ANSWER:**     **Defendant admits that some individuals were taken to the Justice**

Center and held, but otherwise denies the allegations of paragraph 183.

184. While at the jail, Mr. Rose did not receive any medical attention from City employees.

**ANSWER:**     **Defendant is without sufficient knowledge or information to form a belief as to the truth of the allegations of this paragraph and therefore denies the same.**

## COUNT I

*On January 19, 2021, Defendant filed a Motion to Dismiss Count I If the allegations of Count I, including ¶¶ 185-195, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## COUNT II

*On January 19, 2021, Defendant filed a Motion to Dismiss Count II If the allegations of Count II, including ¶¶ 196-206, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## COUNT III

*On January 19, 2021, Defendant filed a Motion to Dismiss Count III If the allegations of Count III, including ¶¶ 207-217, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## COUNT IV

218. Plaintiffs incorporate by reference the allegations in the foregoing paragraphs of this Complaint as if fully set forth herein.

**ANSWER:**     **Paragraph 218 states no allegation of fact requiring a response. To the extent a response is required, denied.**

219. Defendant City is liable to Plaintiff, pursuant to 42 U.S.C. § 1983, for the other Defendant' violation of Plaintiffs' rights because the violations were caused by a policy, practice, or

custom of the St. Louis Metropolitan Police Department. Among the SLMPD policies, practices, or customs that caused constitutional harm to Plaintiffs are the following:

a. SLMPD officers' routine use of excessive force when policing protests, especially those at which police brutality is being protested;

b. SLMPD's custom or practice of refusing to provide medical care to citizens who are arrested, namely, refusing to treat those suffering from pepper spray and refusing to loosen or release dangerously tight zip cuffs and treat resulting injuries;

c. SLMPD policy or custom of using kettling without warning on citizens who are not resisting arrest and who are exercising First Amendment rights, whether those rights be protesting or reporting;

d. SLMPD's policy or custom of issuing vague and even contradictory dispersal orders without giving an opportunity to comply;

e. SLMPD's policy of arbitrarily declaring unlawful assemblies in the absence of any threat or force or violent activity that provides no notice to citizens or unlawful conduct;

f. SLMPD's policy, custom, or practice of violating the Fourth Amendment by regularly conducting unreasonable seizures and arresting individuals without probable cause.

**ANSWER:**     **Paragraph 219 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

220. Further, Defendant City has inadequately trained, supervised, and disciplined SLMPD officers, with respect to its officers' use of kettling and use of force.

**ANSWER:**        **Paragraph 220 contains legal conclusions and argumentative**

**statements that require no response. To the extent that a response is required, denied.**

221. Defendant City had notice that its use of force training and officer supervision was inadequate and likely to result in constitutional violations based on multiple incidents of excessive force against protestors in October 2014, November 2014, July 2015, August 2015, and September 2017.

**ANSWER:** **Paragraph 221 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

222. Even after Defendant City agreed to adopt a new policy on the use of chemical weapons in the March 2015 *Templeton* settlement, Defendant City failed to properly implement the policy, did not initiate or require sufficient retraining of its officers on this supposed policy, and allowed the officers to operate as they had before, as evidenced by the repeated constitutional violations perpetrated by SLMPD officers after that settlement and before the incident at issue in this case.

**ANSWER:** **Paragraph 222 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

223. Additionally, but without waiver of the foregoing, City officials failed to supervise, control, and/or discipline officers of the Department when they engaged in constitutional violations like those set forth above.

**ANSWER:** **Paragraph 223 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

224. SLMPD continues to rely on an Internal Affairs department that had been ineffective at curbing these unconstitutional behaviors, rather than adopt a process for the independent investigation and review of citizen complaints, evidences a continuing policy,

custom or practice of inadequately supervising and disciplining officers for excessive force.

**ANSWER:** **Paragraph 224 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

225. SLMPD failed to implement any new policies or practices to identify or discipline officers for the use of excessive force against individual citizens, particularly in a police brutality protest context, even after demonstrated unconstitutional behavior by SLMPD officers. SLMPD continues to employ, promote and even give additional responsibility to SLMPD officers with a known history of abusive behavior towards protestors.

**ANSWER:** **Paragraph 225 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

226. SLMPD's policy, practice or custom of protecting its officers from the consequences of their unconstitutional behavior—such as clothing officers in riot gear including face masks that hide the officers' identities, allowing officers not to wear name tags or other forms of public identification, failing to document the names and badge numbers of all officers involved in the arrests of protesters, and failing to document the use of force against protestors in any way— evidences the City's deliberate indifference, and complete failure to adequately supervise or discipline its officers to assure compliance with state and federal laws or the Constitution of the United States.

**ANSWER:** **Paragraph 226 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

227. Defendant City has ratified the unsafe and unconstitutional treatment of those arrested by SLMPD officers, particularly in protests, by its failure to adequately investigate complaints and failure to discipline or hold misbehaving officers accountable and remove those

officers from direct contact with civilians.

> **ANSWER:** **Paragraph 227 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

228. In these failures, Defendant City has been deliberately indifferent to the rights of citizens, and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiffs, as alleged herein.

> **ANSWER:** **Paragraph 228 contains legal conclusions and argumentative statements that require no response. To the extent that a response is required, denied.**

229. As a direct result of the conduct of Defendant City described herein, Plaintiff suffered damages, including physical injury, emotional trauma, great concern for Plaintiff's own safety, fear, apprehension, depression, anxiety, consternation and emotional distress, lost time, loss of employment opportunity, and loss of faith in society.

> **ANSWER:** **Defendant denies paragraph 229's allegations.**

230. If Plaintiffs prevail, Plaintiffs are entitled to recover attorneys' fees, pursuant to 42 U.S.C. § 1988.

> **ANSWER:** **Defendant denies paragraph 230's allegations.**

## COUNT V

*On January 19, 2021, Defendant filed a Motion to Dismiss Count V If the allegations of Count V, including ¶¶ 231-240, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## COUNT VI

*On January 19, 2021, Defendant filed a Motion to Dismiss Count VI If the allegations of Count VI, including ¶¶ 241-245, are ever construed to state a claim against Defendant, Defendant denies the*

*allegations in those paragraphs.*

## COUNT VII

*On January 19, 2021, Defendant filed a Motion to Dismiss Count VII If the allegations of Count VII, including ¶¶ 246-250, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## COUNT VIII

*On January 19, 2021, Defendant filed a Motion to Dismiss Count VIII If the allegations of Count VII, including ¶¶ 251-258, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## COUNT IX

*On January 19, 2021, Defendant filed a Motion to Dismiss Count IX If the allegations of Count IX, including ¶¶ 259-269, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## COUNT X

*On January 19, 2021, Defendant filed a Motion to Dismiss Count X If the allegations of Count X, including ¶¶ 270-279, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## COUNT XI

*On January 19, 2021, Defendant filed a Motion to Dismiss Count XI If the allegations of Count XI, including ¶¶ 280-284, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## COUNT XII

*On January 19, 2021, Defendant filed a Motion to Dismiss Count XII If the allegations of Count*

*XII, including ¶¶ 285-295, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## COUNT XIII

*On January 19, 2021, Defendant filed a Motion to Dismiss Count XIII If the allegations of Count XIII, including ¶¶ 296-305, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## COUNT XIV

*On January 19, 2021, Defendant filed a Motion to Dismiss Count XIV If the allegations of Count XIV, including ¶¶ 306-315, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## COUNT XV

*On January 19, 2021, Defendant filed a Motion to Dismiss Count XV If the allegations of Count XV, including ¶¶ 316-323, are ever construed to state a claim against Defendant, Defendant denies the allegations in those paragraphs.*

## OTHER ANSWERS

1.      Defendant denies all allegations of fact contained in the un-numbered "introduction" paragraph to Plaintiff's Second Amended Complaint.

2.      Defendant denies all allegations of fact contained in the "WHEREFORE" clause located after paragraph 261 of Plaintiff's Second Amended Complaint.

3.      Defendant request a jury trial on all issues so triable.

## AFFIRMATIVE DEFENSES

1.      Further answering, Defendant states that Plaintiff's Third Amended Complaint fails to state a claim upon which relief can be granted in each and every count

2..      Further answering, Defendant states that all actions of the individual Defendant officers with regard to Plaintiff were taken on the basis of probable cause or arguable probable cause to believe that Plaintiff was violating ordinances or statutes, that Defendant reasonably believed that said defendant's actions were lawful, that no act of Defendant violated any clearly established constitutional right of Plaintiff, and so the individual Defendant are immune from liability by reason of the doctrine of qualified immunity. Because the individual Defendant herein committed no constitutional tort, Defendant City of St. Louis is not liable to Plaintiff on any theory.

3.       Further answering, Defendant and each of them states that Plaintiff failed to mitigate his damages by failing to disperse as requested by officers of the law and by failing promptly to seek medical attention or treatment for claimed injuries.

4.       Further answering, Defendant states that all state law claims asserted against any defendant in an individual or official capacity are barred by official immunity or by sovereign immunity in that the individual defendant herein, in taking any actions with regard to Plaintiff were exercising discretion in the performance of official duties in preserving public order and arresting persons reasonably believed to be violating valid ordinances or statutes.

5.       Further answering, Defendant states that all state law claims asserted against any defendant in an individual or official capacity are barred because, at the time of each Plaintiff's alleged injury, each individual defendant was performing a public duty in responding to an unlawful assembly and other unlawful acts of numerous persons so as to preserve public order and the rights of the public in general.

6.      Further answering, Defendant states that liability, if any, to Plaintiff cannot be joint and several, and damages, if any, can be awarded against any defendant solely based on that individual defendant's conduct directly causing such damages.

7.      Further answering, Defendant states that any use of force by the individual defendant herein against Plaintiff was privileged because the force was used reasonably applied (a) in order to overcome unlawful resistance to or interference with an arrest, which Plaintiff knew was occurring, (b) in self-defense by the individual defendant, against whom Plaintiff used or threatened to use force to prevent defendant from arresting another person or persons, (c) in defense of third persons, namely other officers at the scene of Plaintiff's arrest, against whom Plaintiff was using or threatening the use of force, or (d) as otherwise authorized by Missouri law, including but not limited to §563.021 and §563.046, RSMo.

8.      Further answering, Defendant states that the injuries suffered by Plaintiff, if any, were of such a nature as can be remedied by existing remedies under the law of Missouri, which state law remedies are sufficient post-deprivation remedies so that Plaintiff was not and is not deprived of any liberty or property interest without due process of law as prescribed by the Fourteenth Amendment by reason of the acts or conduct of Defendant.

9.      Further answering, Defendant states that, with respect to any negligent count asserted by Plaintiff, if Plaintiff suffered any injury by reason of any negligent action of Defendant--which Defendant denies--then and in that event fault must be apportioned to Plaintiff by reason of Plaintiff's negligence or assumption of risk in that Plaintiff chose to encounter the known risk of injury to himself arising from the alleged breach of duty by defendant.

10.     Further answering, the state law claims against Defendant City of St. Louis are barred by sovereign immunity.

11.     Defendant incorporates each and every additional affirmative defense that may be uncovered or made known during the investigation and discovery of this case. Defendant specifically reserves the right to amend this Answer to include additional affirmative defenses at a later time.

WHEREFORE, having fully answered, Defendant respectfully request that this Court dismiss this case, with prejudice, and for any other such relief as this Court deems proper.

Respectfully submitted,
MICHAEL A. GARVIN
CITY COUNSELOR

*/s/ Catherine Dierker*
Catherine Dierker 70025MO
Assistant City Counselor
dierkerc@stlouis-mo.gov
Robert H. Dierker 23671MO
Deputy City Counselor
dierkerr@stlouis-mo.gov
Brandon Laird, 65564 MO
Associate City Counselor
lairdb@stlouis-mo.gov
Abby Duncan 67766 MO
Assistant City Counselor
duncana@stlouis-mo.gov
1200 Market St.
City Hall, Rm 314
St. Louis, MO 63103
314-622-3361
Fax 314-622-4956